SKYLINE MEMORIAL GARDENS, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; DAVID L. SCHROEDER AND TANA SCHROEDER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Skyline Memorial Gardens, Inc. v. Commissioner
Docket Nos. 21565-81, 21642-81.
United States Tax Court
T.C. Memo 1985-334; 1985 Tax Ct. Memo LEXIS 302; 50 T.C.M. (CCH) 360; T.C.M. (RIA) 85334; July 8, 1985. Dana R. Taylor, for the petitioners. Gerald W. Douglas, for the respondent. KORNER
MEMORANDUM FINDINGS OF FACT AND OPINION KORNER, Judge: In these consolidated cases, respondent determined deficiencies of income tax against petitioners as follows: Taxable Year
Deficiency in
Petitioners
Ending
Income Tax
Skyline Memorial
Gardens, Inc.
Jan. 31, 1975
$2,798.00
Dkt. 21565-81
Jan. 31, 1977
3,716.00
David L. Schroeder
and Tana Schroeder
Dec. 31, 1976
218,004.00
Dkt. 21642-81
Dec. 31, 1977
69,774.00
*305 After concessions, [1] the sole issue we must decide is whether the transfer in 1976 by petitioner David Schroeder of 705.60 shares of Skyline Memorial Gardens, Inc. stock to petitioner Skyline Memorial Gardens, Inc., and the assumption by the latter of a portion of a bank loan in connection therewith, resulted in a distribution to petitioner David L. Schroeder which was substantially equivalent to the distribution of an ordinary taxable dividend within the meaning of section 302(b)(1) of the Internal Revenue Code. [2]
The case was submitted to the Court pursuant to the provisions of Rule 122, upon a set of stipulated facts and exhibits. The stipulation of facts, supplemental stipulation of facts, and *306 joint exhibits attached thereto are incorporated herein by this reference and form the basis of our findings of fact. FINDINGS OF FACT Petitioners David L. Schroeder (hereinafter "Schroeder") and Tana Schroeder (husband and wife), are individuals whose residence was in Portland, Oregon, at the time their petition herein was filed. Their joint individual income tax returns for the calendar years 1976 and 1977 were timely filed with respondent at the Ogden Service Center. Petitioner Skyline Memorial Gardens, Inc. (hereinafter "Skyline") is an Oregon corporation with its principal place of business at Portland, Oregon, at the time its petition herein was filed. Its corporate income tax returns for its fiscal years ending January 31, 1975, and January 31, 1977, were timely filed with respondent at the Ogden Service Center. Prior to 1975, Fred R. Collins was the sole shareholder of both Skyline and Lane Memorial Gardens, Inc. (hereinafter "Lane"). Both Skyline and Lane were Oregon corporations engaged in the business of operating funeral homes and cemeteries. Sometime in 1974, Fred Collins married his wife, Donna Mae Collins (hereinafter "Donna"). Fred Collins died on August 15, 1975, and, *307 at the time of his death, was the sole shareholder of Skyline, holding all 998 outstanding shares of its stock. He also owned all the outstanding stock of Lane, in the amount of 998 shares. Upon the death of Fred Collins, the United States National Bank of Oregon became the executor of his estate. During the period of its service as executor, the bank prepared financial statements for the estate showing that the principal assets of the Collins estate were the decedent's shares in Skyline and Lane, and further showing that although the estate had available cash of something less than $10,000, there was an estimated cash requirement for various liabilities, including Federal estate tax, of approximately $206,000. The bank resigned as executor on or about February 5, 1976, and was replaced as successor personal representative by Donna. Prior to the death of Fred Collins, Donna did not take an active part in the business operations of Skyline. After his death, Donna relied on the employees of Skyline to carry on the operations of the business. One of the employees who took an active part in running the business of Skyline after the death of Fred Collins was Schroeder, who had begun *308 his employment with Skyline in June 1972 as a funeral director and who had been promoted to general manager of Skyline in 1974, because of Fred Collins' advanced age. At all times until April 30, 1976, Schroeder was not an officer, director or shareholder of Skyline. After the death of Fred Collins, Schroeder Continued as general manager, but the estate of Fred Collins controlled 100 percent of the stock of both Skyline and Lane. After the death of Fred Collins, Schroeder was interested in acquiring ownership of Skyline and Lane, and he convinced Donna, in her capacity as personal representative for the estate of Fred Collins, to sell both Skyline and Lane to him. Schroeder, however, lacked the financial ability to purchase all of Skyline's stock, and he always intended that Skyline would redeem a major portion of the stock owned by the estate of Fred Collins, and that he would thereafter own a majority of the remaining unredeemed shares. Schroeder also intended that his uncle, Donald Morris, would contribute to the purchase of the unredeemed stock in return for a proportionate minority interest in Skyline. In early 1976 both Donna and Schroeder retained legal counsel to assist *309 them in structuring the sale of Skyline and Lane to Schroeder. Joseph T. Hagen, Schroeder's counsel, devised and proposed several alternative plans under which Schroeder could acquire control of Skyline. All of these plans involved the use of the so-called "boot-strap" technique, whereby the assets and/or the borrowing capacity of Skyline would be used to enable Schroeder to acquire complete control of the two corporations. From early February 1976 through April 1976, Schroeder was in contact and was negotiating with First State Bank of Oregon (hereinafter "State Bank") with a view to negotiating a loan sufficient to fund a boot-strap acquisition of the Skyline stock and to purchase the Lane stock. At State Bank, Schroeder dealt with one of the bank's vice presidents, J. Knox Corbett, Jr., who was interested in funding the Skyline and Lane stock transactions, but wanted to make the loan directly to Skyline, rather than to Schroeder personally, because of Skyline's greater ability to service a loan of the magnitude requested (approximately $600,000). On March 23 and 24, 1976, Orval Hager, as counsel for Donna, and Hagen, as counsel for Schroeder, discussed a possible boot-strap *310 acquisition wherein Skyline would redeem a portion of its stock for approximately $615,810. It was anticipated that Skyline would acquire $400,000 of said funds from a bank loan. Counsel also discussed the possibility of Skyline's liquidating its assets under section 337, in which Schroeder would purchase Skyline's section 1250 assets and Skyline's remaining assets would be purchased by a newly formed corporation in which Schroeder and his uncle, Donald Morris, would have respective 70 percent and 30 percent stock ownership. On the latter date, Hager and Hagen agreed in principle, subject to final approval by Donna's counsel and compliance with state statutes, that Schroeder and Morris would purchase a nominal portion of Skyline's stock from the estate of Fred Collins, and Skyline would redeem the remaining stock. It was discussed that the redemption price to the estate would consist of a substantial cash payment by Skyline and conveyance of all the corporation's section 1250 assets. The estate would then sell the section 1250 assets to Schroeder. It was contemplated that contracts would be prepared describing such transaction within the next week. The necessary final approval, *311 however, was never given. On April 12, 1976, Hager and Hagen further discussed the proposed transaction involving a section 337 liquidation of Skyline, under which Skyline would possibly redeem 90 percent of its stock from the estate of Fred Collins, in return for its section 1250 assets, and the estate would sell its section 1250 assets to Schroeder for the approximate sum of $382,000 subject to a mortgage in the approximate amount of $150,000. It was agreed that Hagen would prepare the necessary deeds to carry out this transaction. Hager was aware that most of the cash that the estate would receive from the stock redemption and from its sale of the section 1250 assets would come from the proceeds which Skyline would borrow from State Bank in the approximate sum of $500,000. On the same date, Donna agreed with Schroeder in principle that Schroeder could acquire Skyline through some form of boot-strap financing technique, but there was no written agreement of any kind whereby Skyline would be liable for and purchase the estate's Skyline stock via a boot-strap acquisition and subsequent corporate redemption. Six days prior thereto, on April 6, 1976, and while negotiations between *312 counsel were still going on, Schroeder and Donna, without the knowledge or approval of Donna's counsel, entered into an "Interim Mutual Management Letter Agreement" which provided in relevant part as follows: Donna Mae Collins, personal representative of the estate of Fred R. Collins, deceased ("Mrs. Collins"); and David Schroeder ("Mr. Schroeder") are negotiating with respect to the purchase by Mr. Schroeder and Don Morris of stock of Skyline Memorial Gardens, Inc., and Lane Memorial Gardens, Inc., also known as Northwest Memorial Gardens (collectively referred to as "Skyline"). It is anticipated that a contract of sale will be executed by said parties during the month of April, 1976. Pending the execution of such contract of sale, Mrs. Collins and Mr. Schroeder agree as follows: 1. From the date of this agreement to the closing of the transactions under the contract of sale ("period") which it is presently anticipated will be April 30, 1976, Mrs. Collins and Mr. Schroeder shall be mutually and equally responsible for the management of Skyline. They shall consult regularly on all phases of the business operations during this period in order to effect an orderly transition of *313 the business. * * * * * * 3. This interim agreement shall terminate on April 30, 1976, unless the contract of sale has been executed by the parties thereto prior to such date. Although the "Interim Mutual Management Letter Agreement" placed certain specific restributions on the right of Donna to obligate or incur liabilities on behalf of Skyline, no corresponding restrictions were expressed with respect to Schroeder. Prior to April 30, 1976, Schroeder, in his capacity as general manager of Skyline, had the authority to write checks on Skyline's corporate bank account, and he was not required to and did not consult with Donna with respect to any such checks which he wrote. On April 13, 1976, State Bank's Executive Loan Committee at corporate headquarters approved a loan to "Schroeder in Skyline's name" [3] in the amount of $625,000 for the purpose of funding a boot-strap acquisition of Skyline's stock. At no time did Donna or her attorney Hager have knowledge of or approve this loan. On the same *314 date, Schroeder executed a loan and security agreement with State Bank for a loan to Skyline in the amount of $600,000. In executing these documents on behalf of Skyline, Schroeder signed himself as Skyline's president. At all times, State Bank knew that Schroeder was only Skyline's general manager, and it did not require that Schroeder be an officer, director or shareholder of Skyline as a condition to approving Skyline's loan. At all times, State Bank knew Schroeder had insufficient assets to obtain or service such a loan personally. At no time did Donna or her counsel have knowledge of or specifically approve said loan by State Bank. In fact, this loan was not consummated. On April 13, 1976, however, State Bank loaned $25,000 to Skyline, also without the approval or knowledge of Donna or her counsel. Skyline then immediately loaned $25,000 to Schroeder, who tendered a check for this amount to Hager, payable to the Estate of Fred Collins, to be held by Donna's counsel as a deposit to be applied upon the purchase by Schroeder of the stock of Skyline and Lane, when the necessary sale agreements had been entered into. Once again, neither Donna nor Hager knew of nor approved *315 the loan from Skyline to Schroeder. On or about April 13, 1976, and at all times subsequent thereto, Donna, based upon the advice of her counsel, decided not to sell the Skyline stock directly to Skyline. It was Donna's position that the estate would only sell its Skyline stock directly to Schroeder and not to Skyline. At all times subsequent to April 13, 1976, Schroeder was aware of this decision by Donna. Donna's decision not to sell the Skyline stock directly to Skyline was based on her concern that such a sale might impair Skyline's capital, in violation of Oregon Law, and her concern for the tax implications of such an arrangement. At no time did Donna or her counsel ever communicate to State Bank that Donna intended to or agreed to sell Skyline's stock to Schroeder via a boot-strap acquisition and subsequent corporate redemption by Skyline. On April 16, 1976, Schroeder individually and Donna as personal representative of the estate of Fred Collins entered into a contract for the sale by the estate to Schroeder personally of all the issued and outstanding shares of stock of skyline and Lane. As relevant and material to the instant controversy, this contract included the *316 following provisions: 1. The purchase price for the Lane stock was $150,000, and the purchase price for the Skyline stock was $591,070 (determined by deducting from the sum of $775,000 the then principal balance in the sum of the $183,930 of a mortgage held by United States National Bank of Oregon on certain real property of Skyline). 2.(a) Schroeder was to pay for the stock of Lane with a certified or bank check in the full amount of $150,000. 2.(b) Schroeder was to pay for the shares of Skyline by delivering to the estate of Fred Collins the following: (i) a certified check or bank check
in the amount of
$450,000
(ii) Schroeder's personal promissory
note payable to the order of the
estate of Fred Collins
116,070
(iii) credit advance deposit of
25,000
Purchase price
$591,070
4. At the closing of this contract, which was scheduled to be held on April 30, 1976, Schroeder was obligated to deliver to Donna, on behalf of the estate of Fred Collins, all the above items constituting payment for the shares of Lane and Skyline, together with a certificate for all shares of Lane stock, made out in the name of Schroeder individually and endorsed in blank by *317 him, to be delivered to Donna as a pledge or collateral securing the payment by Schroeder of the full purchase price for the stock of Skyline. On the same closing date the seller (Donna, as personal representative of the estate of Fred Collins) was obligated to deliver to Schroeder all the stock of both Lane and Skyline, together with the payment of certain debts to or on behalf of Skyline, and the purchase of an authomobile owned by Skyline. Donna was further required to tender the resignation of all officers and directors of Skyline and Lane. At all material times, Schroeder was unable to perform his obligations under the purchase contract with Donna without having access to loan proceeds from State Bank. Donna as seller was likewise unable to perform her obligations with respect to specified payments under the sale agreement unless Schroeder was able to make his required payments to her. On April 23, 1976, Schroeder and his wife Tana signed a standard form of guarantee agreement with State Bank, in which they guaranteed personally the payment by Skyline of the $600,000 loan which had been approved by State Bank (but not yet disbursed). Neither Donna nor her counsel Hager were *318 aware of this guarantee agreement. Six days later, however, and on or about April 29, 1976, Schroeder instructed State Bank to restructure the form of the proposed loan, which Schroeder was intending to use to fund the Skyline boot-strap acquisition, so that the loan would be made from State Bank to Schroeder personally. In a letter of the same date to State Bank, Schroeder's counsel Hagen informed the bank that due to unforeseen exigencies Schroeder was required to purchase all of Skyline stock directly from the estate of Fred Collins and that the earlier April 13, 1976 loan agreement should be restructured so that State Bank would make the loan to Schroeder personally instead of to Skyline. In this same letter, Hagen informed State Bank of Schroeder's plans and intentions as follows: We would like, shortly after the April 30, 1976 closing, to bring Schroeder's uncle in as a thirty percent (30%) shareholder of Skyline and also have Skyline assume, through a redemption of Schroeder's stock, direct liability for the major portion of the Bank's loan. Also, as you indicated in our phone conference, Schroeder will be required to pledge his stock as security for the loan until such *319 time as and to the extent that Skyline assumes direct responsibility for the loan. In order to permit the sale of the Skyline stock from the estate of Fred Collins to Schroeder to be consummated, State Bank agreed to make a "gap" loan to Schroeder as a temporary expedient.The bank, however, still insisted that Skyline should be responsible for a major portion of the loan. The bank, therefore, agreed to the "gap" loan to Schroeder only on condition that Skyline would assume responsibility for most of the loan immediately after the transfer of stock from the Collins' estate to Schroeder. To secure Skyline's performance, it was understood that the bank would take possession of all 998 shares of Skyline stock at the closing and until Skyline executed a loan agreement satisfactory to the bank. It was further understood between State Bank and Schroeder that upon assuming responsibility on the bank loan, Skyline would redeem a proportionate amount of its stock. On April 30, 1976, in the presence of Donna, Schroeder, their respective counsel, a representative of State Bank and other interested parties, and purchase contract between Schroeder and the estate of Fred Collins went to closing *320 in accordance with its terms. The following events took place: (a) State Bank presented bank checks in the amount of $600,000 to Donna; (b) Schroeder individually executed and delivered his promissory note to State Bank in the amount of $600,000; (c) Donna then delivered the outstanding stock certificate of Skyline to State Bank; (d) Donna then delivered cash to Schroeder in the aggregate amount of $107,964.80, in discharge of her obligations under the purchase contract; (e) the total purchase price of Skyline stock of $591,070 was satisfied by Schroeder as follows: Advance payment of April 13, 1976
$ 25,000
Promissory note to Donna (secured
by pledge of all the Lane stock)
116,070
Loan from State Bank
450,000
Total
$591,070
Skyline's stock was thus originally purchased from the estate of Fred Collins on April 30, 1976 solely in the name of petitioner David Schroeder. On April 30, 1976 petitioners David L. and Tana Schroeder executed a Term Loan Agreement with State Bank with reference to the $600,000 loan. The agreement described the borrowers as individuals (i.e. petitioners David L. and Tana Schroeder) and described Skyline as a guarantor. Among *321 its various provisions it was provided that David and Tana Schroeder would pledge their stock in Skyline to the bank to secure the loan, and that Skyline would guarantee and pledge its assets to secure said loan. Also on April 30, 1976, Schroeder, describing himself as the sole shareholder of Skyline, executed a "consent to corporate action," in lieu of a special meeting of shareholders, in which, inter alia, the corporation agreed to pledge all its assets with State Bank for the purpose of guaranteeing and securing the loan which State Bank had made to Schroeder in the principal amount of $600,000. Although, as described above herein, the $600,000 loan was made by State Bank to Schroeder individually, the bank maintained among its records a "memorandum for credit files" with respect to Skyline, in which the $600,000 loan of April 30, 1976 was shown as a loan to Skyline. In its books and records, Skyline recorded the $600,000 loan from State Bank in a "suspense clearing account" under date of May 1, 1976. The suspense clearing account ws established on Skyline's books as temporary account until the State Bank loan could be restructured and apportioned among Schroeder, his uncle *322 Donald Morris, and Skyline. On May 3, 1976 Skyline paid $25,126.37 to State Bank as repayment of principal and interest on the $25,000 loan which State Bank made to Skyline of April 13, 1976, and which amount Skyline had in turn loaned to Schroeder. On the same date, Schroeder entered into a term loan agreement with Skyline promising to repay to Skyline $25,126.37 at seven percent interest. (The $25,000 principal amount in these transactions was used by Schroeder as a down payment or deposit on his purchase of Skyline stock from the estate of Fred Collins, as previously described.). State Bank took the Skyline stock at the closing of April 30, 1976 as security for the loan it made to Schroeder for his use in the purchase of Skyline stock, inter alia, and State Bank retained all such stock until the loan to Schroeder was restructured in such form that Skyline acknowledged primary responsibility for a major portion of the loan. On May 26, 1976 Skyline made the first payment due on the $600,000 loan in the amount of $12,601.86, consisting of $7,142.85 of principal and $5,449.01 of interest, [4] leaving an unpaid principal balance in the amount of $592,857.15. State Bank, however, *323 informed Schroeder's counsel, Hagen, that it could not accept a payment from Skyline with respect to a loan which had been made to Schroeder. As the result of this development, Skyline declared and booked a $13,000 bonus to Schroeder, of which $12,601.86 was treated as satisfied by Skyline's payment to State Bank, as above, and $128.56 was paid to Schroeder directly by Skyline. [5] No further payments on the $600,000 loan were made until August 1976. On July 1, 1976, but effective on August 1, 1976, State Bank, the Schroeders, Donald Morris and his wife, and Skyline refinanced the loan from State Bank to Schroeder. The refinancing took the following form: A. Schroeder's promissory note for $600,000 to State Bank was replaced by three new promissory notes, each dated July 1, 1976, with interest only payable August 10, 1986 and the first installment payment of principal and interest due September 10, 1976, as follows: (i) a promissory note to State Bank from Skyline in *324 the amount of $400,000; (ii) a promissory note from Schroeder and his wife Tana in the amount of $140,021.32; and (iii) a promissory note from Morris and his wife Jean Morris in the amount of $52,835.83. The balance of all three notes, after periodic payments, was to mature on July 10, 1983. B. Each of the three new borrowers, viz, Skyline, the Schroeders, and the Morrises, executed guarantee agreements with State Bank whereunder each borrower guaranteed the borrowings of the other two borrowers. C. The Schroeders and the Morrises agreed to pledge their Skyline stock with State Bank to secure all the above new loans, and Skyline agreed to pledge all its assets with State Bank for the same purpose. In conjunction with the above refinancing of the $600,000 loan from State Bank to Schroeder, Skyline, Schroeder and Donald Morris on August 1, 1976, entered into a "redemption and sales agreement," under which Schroeder transferred to Skyline 705.60 shares of his 998 shares of Skyline stock, and further transferred 87.72 shares to Morris, with Schroeder retaining the remaining 204.68 shares for himself. This division of the Skyline shares, as between Skyline and Schroeder, *325 resulted in Skyline acquiring 70.7 percent of its outstanding stock, while only being responsible for 67.5 percent of the renegotiated loan. Conversely, Schroeder retained only 20.5 percent of Skyline's outstanding stock, while remaining responsible for 23.6 percent of the renegotiated $600,000 loan. The sales and redemption agreement accordingly made an adjustment to correct this imbalance, by (a) canceling $20,000 of the $25,126.37 debt from Schroeder to Skyline and (b) giving Schroeder credit for loan payments of $12,601.86 made by him to State Bank as a first installment payment on the loan prior to its renegotiation. The "redemption and sales agreement" recited that all the outstanding stock of Skyline was subject to the security interest held by State Bank, and further recited that after the transfers, the stock of Morris and the remaining stock of Schroeder would continue to be subject to the security interest of State Bank. Skyline issued new stock certificates, under date of August 1, 1976, to Schroeder in the amount of 204.68 shares, and to Morris in the amount of 87.72 shares. On its books, Skyline recorded the acquisition of 705.60 shares of its stock as treasury *326 stock, at a cost of $420,000. [6]
Both the minutes of the board of directors of Skyline authorizing the above transaction, as well as the "redemption and sales agreement," consistently refer to the $600,000 loan from State Bank as having been made to Skyline rather than to Schroeder. In their 1976 joint income tax return, as originally filed, petitioners David and Tana Schroeder did not report the transfer of 705.60 shares of Skyline Memorial Gardens from Schroeder to Skyline. An amended 1976 return was later filed by the Schroeders, in which Schroeder's sale of stock to Skyline and Morris were reported as short-term capital gains, in the respective amounts of $2,105 and $883, and an additional tax of $840 was paid with respect thereto. In 1979, after the Internal Revenue Service announced its intention to audit the returns of Skyline, and in particular the 1976 redemption and sale of Skyline stock, a second amended income tax return was filed by the Schroeders for 1976, which took the position that there was a single integrated transaction *327 under which Schroeder had only purchased a portion of the Skyline stock, and had sold no such stock in 1976. A refund of the $840 tax paid with the first amended return was claimed. Upon audit, respondent determined that Skyline had redeemed 705.60 shares of its stock owned by Schroeder in 1976 for a price of $420,000, and that such redemption by Skyline was assentially equivalent to an ordinary taxable dividend with respect to Schroeder. At no time was the redemption of Skyline stock substantially disproportionate with respect to any shareholder, nor did the redemption of Skyline stock terminate any shareholder's interest. OPINION At issue in this case is whether the restructuring of the debt which Schroeder owed to State Bank, by having Skyline assume $400,000 of said debt, cancel $20,000 of the debt owed to it by Schroeder, and at the same time acquire 705.60 shares of its stock then owned by Schroeder, constituted a distribution to or for his benefit which was essentially equivalent to the distribution of an ordinary taxable dividend within the meaning of sections 301, 316 and 317, or whether such redemption and assumption of indebtedness took place under such circumstances *328 that it should be considered "not essentially equivalent to a dividend," within the meaning of section 302(b)(1). [7]
*329 Section 1.302-2(b), Income Tax Regs., provides in relevant part: The question whether a distribution in redemption of stock of a shareholder is not essentially equivalent to a dividend under section 302(b)(1) depends upon the facts and circumstances of each case. In other words, the question presented is essentially factual, and all aspects of the transaction are to be examined. See Decker v. Commissioner,32 T.C. 326, 331 (1959); Green v. Commissioner,T.C. Memo. 1963-248; McShain v. Commissioner,T.C. Memo. 1963-306. In support of his position, Schroeder strenuously argues that what occurred in this case was a single integrated transaction, composed of several parts. He urges that it was the intention throughout that the corporation should redeem its shares, as was ultimately done here; that Schroeder's acquisition of the stock of Skyline in his own name and pursuant to his own personal obligation was nothing more than a temporary expedient, required by the seller as well as the bank, and should be ignored; and that his acquisition of the Skyline shares on April 30, 1976 should be considered simply as a first step *330 which finally culminated in the rearrangement of July 1, 1976, with Skyline redeeming its shares as originally intended. In this scenario, Schroeder urges, it is only his intent which should be considered, without regard to the intentions of the sellers of the the Skyline stock or of Skyline itself. Schroeder further urges that in any case his obligation to acquire the stock of Skyline was conditional and was not his personal obligation. Without the money provided by State Bank, Schroeder argues, he could not have performed his part of the purchase contract from the estate, nor could the estate have performed its obligations under the contract. Thus, he urges, he did not incur the primary and unconditional obligation to purchase the stock, but was merely acting as a conduit for Skyline, which at all times was to be considered as the true intended purchaser. On the other hand, respondent urges that there was no mutually agreed plan for Skyline to acquire its own stock; that the seller never agreed to such a plan; that Skyline never agreed to such a plan, prior to the time it came under Schroeder's control; that Schroeder acquired the stock for himself and under his own binding *331 personal obligation to the bank; and that when Skyline later redeemed its stock and the debt was renegotiated, it satisfied a personal obligation of Schroeder which was essentially equivalent to the payment to him of a taxable dividend. In this connection, respondent further urges that Schroeder should not be considered in this transaction as acting purely as agent or conduit for Skyline in the acquisition and later disposition of the shares, since Skyline had not agreed to the plan and he had no authority to act for it. Considering the record as a whole, we think that respondent has the better of the argument. As we review the complicated and frequently shifting facts in this case, and measure them against the many cases which have been decided on this troublesome question, we think that the following facts established by this record require us to hold that Skyline's partial redemption of Schroeder's stock resulted in a distribution essentially equivalent to a taxable dividend: 1. The facts here show that there was no common or mutually agreed plan of action between the estate of Fred Collins, Schroeder and Skyline whose object was the ultimate redemption by Skyline of a part *332 of its stock. Unquestionably, this is what Schroeder intended; the facts show, however, that this intent was peculiar to him. Donna, as personal representative of her husband's estate and as seller, made it clear by April 13, 1976, that she would not agree to Skyline redeeming its stock as part of the boot-strap operation being promoted by Schroeder. Instead, she insisted that Schroeder buy the stock personally, and this in fact is what happened. So far as Skyline is concerned, it cannot be said to have had any intention different from Donna's since she was in control of Skyline's stock. What therefore really happened here was that Schroeder, because of Donna's insistence, had to buy the Skyline stock himself, and that is what he did. He then held it for two months, from April 30, to July 1, 1976, before he could get his personal debt with State Bank restructured so that Skyline would take over a portion of his shares proportionate to the amount of his personal debt which Skyline assumed. When Skyline relieved Schroeder of a portion of his debt, in return for an equivalent number of shares, it amounted to the distribution by Skyline to Schroeder of money or money's worth. *333 Sachs v. Commissioner,32 T.C. 815, 820 (1959), affd. 277 F.2d 879, 882 (8th Cir. 1960), cert. denied 364 U.S. 833 (1960); Sullivan v. United States,363 F.2d 724 (8th Cir. 1966); Edenfield v. Commissioner,19 T.C. 13 (1952); Smith v. Commissioner,70 T.C. 651 (1978). 2. Schroeder's contention that the entire transaction here should be viewed as a single integrated plan, with Schroeder acting as agent or conduit for the corporation which was intended to be the ultimate recipient of the stocck, simply will not wash on this record. As we have said, it is clear that there was no mutually agreed plan between seller and buyer and the corporation. The intention to have the corporation redeem its own stock was Schroeder's intention alone. It cannot be said here that Schroeder was acting as agent or conduit for the corporation in acquiring the stock on April 30, 1976. At that point, Schroeder was neither an officer, director nor a shareholder of Skyline, and he had no apparent authority to bind or commit Skyline to acquire its own stock or to borrow $600,000 from the bank in Skyline's *334 name. His actions in undertaking to arrange loans for Skyline with State Bank, signing himself falsely at times as Skyline's president, are questionable, to say the least. [8] Not until after he had acquired the Skyline stock on April 30, 1976, in his own name and pursuant to his own personal obligation to State Bank, could he have caused his intention to become Skyline's intention. This he undertook to do on July 1, 1976, when the debt to State Bank was restructured, and on August 1, 1976, when his stock was redeemed by Skyline, but we think that was another and different transaction. He was certainly not Skyline's agent or conduit at the time he acquired the stock on April 30, 1976. Prior to that time, he was not even a shareholder. His argument must thus fail. Stephens v. Commissioner,60 T.C. 1004 (1973), affd. 506 F.2d 1400 (6th Cir. 1974); Wall v. United States,164 F.2d 462 (4th Cir. 1947); McKeown v. Commissioner,T.C. Memo. 1980-18. [9]
3. Schroeder's further argument that he was not personally liable on the note which he executed to State Bank on April 30, 1976, because the obligations of his purchase *335 contract were "conditional," in that neither he nor Donna as seller had the financial ability to carry out the provisions of that contract of purchase and sale, without use of the bank's money, is without merit. Every executory contract which requires the parties thereto to perform at a later date is conditional in the sense that one party or the other may fail of performance. This does not make an otherwise binding and unconditional contract conditional in the legal sense. Schroeder's contract to buy the Skyline stock from Donna, as personal representative of the estate of her late husband, was an unconditional obligation, as was Schroeder's note to the bank. *336 The instant case is quite similar to the facts which were presented in the case Adams v. Commissioner,69 T.C. 1040 (1978), affd. 594 F.2d 657 (8th Cir. 1979). In that case, the taxpayer, not then being a shareholder, set out to acquire the stock of a bank. The selling stockholders knew that the taxpayer intended to have the bank provide the funds for a redemption of some of the stock. Once the taxpayer obtained control of the bank, he caused the bank to redeem part of the stock he had previously purchased from the sellters. Prior to acquiring control of this stock from the sellers, taxpayer had no authority to act as agent for the bank. On this set of facts, this Court and the Court of Appeals for the Eighth Circuit had no difficulty in finding that the redemption of part of his stock resulted in ordinary taxable dividend to the taxpayer. We think the same result is dictated here. As we have found, the only consistent intent here was Schroeder's intent to have Skyline redeem a portion of his shares. This being true, a distribution equivalent to a dividend to Schroeder occurred when Skyline assumed a portion of his indebtedness to the bank. See *337 Tabery v. Commissioner,354 F.2d 422 (9th Cir. 1965), affg. T.C. Memo. 1964-189. The rule applicable in this case was well summarized by the Court in the case of Pulliam v. Commissioner,T.C. Memo. 1984-470, where we said: Generally, a corporate payment for the stock of other shareholders does not affect the tax liability of the remaining shareholder. The law is well settled, however, that when a shareholder previously had been bound to pay for the stock himself, the corporation's payment of his obligation is taxed as the equivalent of a corporate distribution to him, and will generally be taxed as a dividend to the extent of the corporation's earnings and profits under sections 301, 316 and 317. E.g. Wall v. United States,supra.This rule derives from the principle of Old Colony Trust Co. v. Commissioner,279 U.S. 716 (1929), that having one's liabilities satisfied by another is equivalent to receiving cash for income tax purposes. The rule, therefore, is that a shareholder who was subject to a binding personal obligation to buy the stock is deemed to have received a corporate distribution *338 when the corporation pays instead, while a shareholder who was not so obligated is not affected by the corporate purchase. Compare Wall v. United States,supra with Edenfield v. Commissioner,supra. This essentially factual inquiry focuses on whether the personal obligation existed when the purchase occurred. Bennett v. Commissioner,supra. [48 T.C.M. at 1022, 53 P-H Memo T.C. par. 84,470 at 1878] On the issue presented, therefore, we hold for respondent. Decisions will be entered under Rule 155.
Footnotes
1. In addition to the issues which the parties have settled, the parties have further stipulated that certain other issues will be resolved by the Court's resolution of the single issue presented for our decision, all as stipulated by the parties. ↩
2. All statutory references are to the Internal Revenue Code of 1954, as in effect in the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise noted.↩
3. So stipulated by the parties. The records of the Executive Loan Committee of State Bank approving this transaction are not in evidence, and we find the meaning unclear.↩
4. So stipulated by the parties. The principal and interest elements, however, add up to $10 less than the whole amount. ↩
5. What happened to the remaining $269.58 of the $13,000 bonus is not explained.↩
6. Anomalously, the stipulated exhibits show the apparent issuance by Skyline of a stock certificate to itself in the amount of 705.60 shares.↩
7. As it read in the year in question, sec. 302(a) provided as follows: (a) General Rule.--If a corporation redeems its stock (within the meaning of section 317(b)), and if paragraph (1), (2), (3), or (4) of subsection (b) applies, such redemption shall be treated as a distribution in part or full payment in exchange for the stock. The parties have stipulated that the exceptions of sec. 302(b)(2) and 302(b)(3) (involving a substantially disproportionate redemption of stock and the termination of a shareholder's interest) do not apply herein. Likewise, sec. 302(b)(4) (relating to stock issued by railroad corporations) has no application under the present facts. This leaves only secs. 302(b)(1) and 302(b)(5), which read: (1) Redemptions Not Equivalent to Dividends.--Subsection (a) shall apply if the redemption is not essentially equivalent to a dividend. * * * (5) Application of paragraphs.--In determining whether a redemption meets the requirements of paragraph (1), the fact that such redemption fails to meet the requirements of paragraph (2), (3), or (4) shall not be taken into account. * * *↩
8. In Oregon, not even a corporate president has unrestricted power to borrow in the corporation's name. See Phillips v. Colfax Co.,195 Or. 285, 243 P.2d 276 (1952), rehearing den. 195 Or. 301, 245 P.2d 898. Note further the provisions of Oregon law: Loans. A corporation shall not lend money to or use its credit to assist a director of the corporation without authorization in the particular case by the affirmative note of the holders of at least three-fourths of the shares entitled to vote. However, a corporation may lend money to and use its credit to assist an employe of the corporation or of a subsidiary, including an employe who is a director of the corporation, if the board of directors decides that the loan or assistance may benefit the corporation. Or. Rev. Stat. sec. 57.226 (1975). There is no suggestion in this record that Schroeder had any authority from Skyline's board of directors to borrow $600,000 in Skyline's name, or to guarantee Schroeder's personal debt, on April 30, 1976, when he acquired the Skyline stock. Certainly the "Interim Mutual Management Letter" of April 6, 1976, gave him no such broad authority. ↩
9. The cases principally relied on by Schroeder in support of his position herein are thus distinguishable from the facts of the instant case on either or both of the above grounds. Compare Fox v. Harrison,145 F.2d 521 (7th Cir. 1944); Green v. Commissioner,T.C. Memo. 1963-248; Peterson v. Commissioner,T.C. Memo. 1964-15; McShain v. Commissioner,T.C. Memo. 1963-306; Bennett v. Commissioner,58 T.C. 381 (1972); Ciaio v. Commissioner,47 T.C. 447 (1967); Decker v. Commissioner,32 T.C. 326↩ (1959).