JOHN A. ARNES, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 23291–91.                Filed April 5, 1994.

*Darrell D. Hallett*, for petitioner.
*Lisa M. Oshiro*, for respondent.

FAY, *Judge*: This case is before the Court on the parties' cross-motions for summary judgment pursuant to Rule 121.[1]

---

[1] All Rule references are to the Tax Court Rules of Practice and Procedure, and all section references are to the Internal Revenue Code in effect for the years in issue, unless otherwise indicated.

By notice of deficiency dated October 8, 1991, respondent determined deficiencies in petitioner's Federal income taxes as follows:

| Year | Deficiency |
| --- | --- |
| 1987 | $42,725 |
| 1988 | 27,337 |

### FINDINGS OF FACT

John A. Arnes (petitioner) resided in Ellensburg, Washington, when he filed the petition.

Petitioner and his former wife, Joann Arnes (Joann), were married in 1970. After having worked for a number of years in McDonald's restaurants and for McDonald's Corp. (McDonald's), petitioner developed an interest in operating his own McDonald's franchise.

On October 8, 1979, petitioner and Joann entered into a license agreement with McDonald's granting them a McDonald's franchise in Ellensburg, Washington. After about a year, they formed Moriah Valley Enterprises, Inc. (Moriah), to own and operate the franchise, and 5,000 shares of Moriah stock were issued to petitioner and Joann jointly.

The articles of incorporation of Moriah include a right of first refusal, which states in relevant part as follows:

In the event any one or more of the shareholders of this corporation should desire to sell or transfer all or any part of his stock in the corporation and retire from the said business, * * * *then the corporation shall have the option to purchase and acquire the whole of the stock interest of such party * * * so desiring to sell or transfer his interest.* In the event the corporation does not exercise this option, the shareholders shall have a secondary option to purchase said shares at the same price contained in the corporation's options; said secondary option of the shareholders to be computed on a basis of number of shares held on a pro rata basis. Nothing in this paragraph shall prevent the corporation and the shareholders from agreeing to terms and conditions relating to the exercise of the foregoing option as to time within which to exercise the option, terms of payment, security for payment, methods of effecting transfer, and related matters. [Emphasis added.]

On August 5, 1981, McDonald's executed a memorandum entitled "Change of Unit Ownership" recognizing and approving the assignment of the McDonald's franchise to Moriah

and also noting that petitioner and Joann were both 50-percent owners of Moriah.

Petitioner and Joann permanently separated in January 1987. McDonald's wrote a letter dated January 14, 1987, to petitioner, which states in pertinent part:

In conjunction with your pending divorce, we would like to explain McDonald's position concerning dissolution of the marriages of McDonald's operators.

As you know, we are primarily concerned with the operation of the McDonald's restaurant, and an essential element of good operations is 100% ownership of the equity and profits by the owner/operator on premises. Since all divorces include some sort of property settlement, we want to be assured that there is no *joint* ownership of the McDonald's restaurant business by you and your wife after you divorce and the spouse who ends up with the business is operationally and financially qualified.

We have the right to consent to such a property settlement because it results in a change in the equity ownership of the business and changes the status of the former husband and wife to that of a partnership of unrelated parties. As you know, it has been a long-standing franchising policy of this company to refuse to franchise partnerships.

On December 16, 1987, petitioner and Joann surrendered their jointly held shares of Moriah stock and were each issued separate stock certificates representing 2,500 shares of Moriah stock. On December 17, 1987, petitioner and Joann entered into an agreement regarding property custody and support (the property settlement agreement), providing in part as follows:

The parties hereto shall cause the corporation owned by the parties known as Moriah Valley Corporation to redeem from wife 2,500 shares of stock (Certificate #4) that she owns, said shares being one-half of the issued stock. That the obligations of the corporation to pay wife in accordance with the provisions hereinafter set forth, shall be and are personally guaranteed by husband and the corporation shall execute any security documents and/or other instruments necessary to secure and perfect the security granted to wife for said obligation. The corporation shall pay to wife the sum of FOUR HUNDRED FIFTY THOUSAND DOLLARS ($450,000.00) for wife's stock in the corporation. Of said sum, ONE HUNDRED TEN THOUSAND NINE HUNDRED EIGHTY-THREE AND 56/100ths DOLLARS ($110,983.56) shall be paid by the corporation by forgiving that certain Promissory Note dated April 17, 1987 in the principal sum of ONE HUNDRED FIVE THOUSAND DOLLARS ($105,000.00) that has accured [sic] interest of FIVE THOUSAND NINE HUNDRED EIGHTY-THREE AND 56/100ths DOLLARS ($5,983.56). That on the 2nd day of January, 1988, the corporation shall pay to wife the sum of TWENTY-FIVE THOUSAND DOLLARS ($25,000.00) and a like sum on the 1st day

of May, 1988. That the balance of TWO HUNDRED EIGHTY-NINE THOUSAND SIXTEEN AND 44/100ths DOLLARS ($289,016.44) shall be paid by the corporation to wife and shall bear interest from January 1, 1988 at the rate of nine percent (9%) per annum and shall be paid through monthly installments of THREE THOUSAND SIX HUNDRED SIXTY-ONE AND 84/100ths DOLLARS ($3,661.84) per month commencing February 1, 1988. That said obligation shall be paid in full no later than January 1, 1998.

On December 28, 1987, Moriah and Joann entered into an agreement as to corporate stock providing for a redemption by Moriah of Joann's stock, with Moriah's obligation guaranteed by petitioner.

The property settlement agreement was filed with the Superior Court of Washington for Kittitas County and incorporated in the decree of dissolution of marriage by the court, entered on January 7, 1988.

On January 18, 1988, Joann, petitioner, and McDonald's executed an assignment and consent to redemption of stock (the McDonald's consent agreement). The McDonald's consent agreement provided that Moriah would redeem Joann's stock in accordance with the payment schedule set forth in the property settlement agreement and that petitioner would be the guarantor of Moriah's payment obligations thereunder.

At all times during the divorce proceeding and during the negotiations relating to the redemption of Joann's stock in Moriah, petitioner and Joann were each represented by an attorney.

On her Federal income tax return for 1988, Joann reported and paid the tax on capital gain arising out of the redemption. Joann subsequently claimed a refund of income tax on the ground that under section 1041 she was not required to recognize gain on the redemption because it should be deemed a nontaxable transfer of property from Joann to Moriah on behalf of petitioner, and then she initiated a refund suit in the U.S. District Court for the Western District of Washington. The District Court granted summary judgment in Joann's favor in *Arnes v. United States*, 91–1 USTC par. 50,207 (W.D. Wash. 1991), concluding that section 1041 governed the income tax consequences of the transaction to Joann.

On February 10, 1992, petitioner filed his motion for partial summary judgment in this case. On March 9, 1992, respondent filed a motion to stay proceedings and also a response to petitioner's motion for partial summary judgment, in part contending that the stay would conserve this Court's time because the Court of Appeals for the Ninth Circuit's decision in Joann's case would be dispositive of this case. On March 19, 1992, petitioner filed his objection to respondent's motion. By order dated July 8, 1992, we granted respondent's motion. On August 12, 1992, petitioner filed a motion for reconsideration of order staying proceedings and also a memorandum in support of such motion, in part stating that it would be beneficial for the Court of Appeals for the Ninth Circuit to consider both Joann's and petitioner's cases simultaneously if respondent were to lose this case. On September 21, 1992, respondent filed a response to petitioner's motion for reconsideration of order staying proceedings, objecting to petitioner's motion. By order dated October 2, 1992, this Court denied petitioner's motion.

Thereafter, the District Court's decision in Joann's case was argued before and affirmed by the Court of Appeals for the Ninth Circuit in *Arnes v. United States*, 981 F.2d 456 (9th Cir. 1992).

OPINION

Respondent argues that the decision in *Arnes* controls our decision here. Petitioner contends, to the contrary, that Moriah redeemed Joann's stock and that no constructive dividend resulted to petitioner. We agree with petitioner and consider his motion first.

Summary judgment is appropriate where the record shows that there is no genuine issue as to any material fact and that a decision may be rendered as a matter of law. Rule 121(b); *Sundstrand Corp. v. Commissioner*, 98 T.C. 518, 520 (1992), affd. 17 F.3d 965 (7th Cir. 1994); *Marshall v. Commissioner*, 85 T.C. 267, 271 (1985). The burden of proof is on the moving party to show that no issue of material fact exists. We view the evidence in the light most favorable to the party opposing the motion. *Blanton v. Commissioner*, 94 T.C. 491, 494 (1990); *Jacklin v. Commissioner*, 79 T.C. 340, 344 (1982). A motion for summary judgment will be denied

if there is any reasonable doubt as to the facts in issue. *Hoeme v. Commissioner*, 63 T.C. 18, 20 (1974).

The issue before us is whether Moriah's redemption of Joann's stock resulted in a constructive dividend to petitioner. If a corporation redeems stock that its remaining shareholder was obligated to buy, a constructive dividend results to the remaining shareholder. *Wall v. United States*, 164 F.2d 462 (4th Cir. 1947); *Hayes v. Commissioner*, 101 T.C. 593 (1993); *Edler v. Commissioner*, T.C. Memo. 1982–67, affd. 727 F.2d 857 (9th Cir. 1984). However, this rule is limited to those circumstances where the obligation of the remaining shareholder is both primary and unconditional. *Enoch v. Commissioner*, 57 T.C. 781 (1972); *Priester v. Commissioner*, 38 T.C. 316 (1962); *Edenfield v. Commissioner*, 19 T.C. 13 (1952); *Edler v. Commissioner, supra*.

In *Edler v. Commissioner*, 727 F.2d 857 (9th Cir. 1984), the Court of Appeals for the Ninth Circuit affirmed our decision that the taxpayer did not receive a constructive dividend when the corporation in which he was the majority shareholder redeemed the stock owned by his former spouse. In that case, an interlocutory divorce judgment had awarded the taxpayer all of the stock in the company and had ordered him to deliver a promissory note payable to the wife. A nunc pro tunc order was later entered, deleting reference to the husband's obligation or to the enforcement and execution of this promissory note, and incorporating an agreement between the husband and wife, which read, in pertinent part, as follows:

whereunder * * * [the wife] would give up [her] money judgment position, recall the writ of execution, * * * and substitute, in the place and stead thereof, the delivery * * * of a minority shareholder position in Edler Industries, Inc., ON THE CONDITION that the corporation concurrently, redeem for cash, said minority shares * * * for the same amount of said money, to which * * * [the wife] is now entitled. [*Id.* at 858–859.]

After the modification, the husband had a secondary obligation to the wife to be fulfilled only if the corporation failed to redeem her stock.

The Court of Appeals expressed no doubt that the original agreement between the parties had created an obligation of the husband which would have resulted in a constructive dividend to him if the stock had been redeemed by the cor-

poration. However, the court affirmed our holding that, under the nunc pro tunc modification, the husband did not have a primary and unconditional obligation, and that, therefore, there was no constructive dividend. In so doing, the Court of Appeals for the Ninth Circuit noted that, in the Tax Court, respondent had not questioned the ability of the divorce court to modify its own judgment and that it, therefore, would not consider, on appeal, whether, under *Commissioner v. Estate of Bosch*, 387 U.S. 456, 465 (1967), the Tax Court should not have given effect to the nunc pro tunc order. *Edler v. Commissioner, supra* at 859.

Despite respondent's attempts to distinguish *Edler*, the undisputed facts in the case before us are even more compelling for concluding that petitioner did not have a primary and unconditional obligation to acquire Joann's stock. From the inception, Moriah was obligated to redeem Joann's stock; there was no nunc pro tunc order changing a prior obligation of petitioner. The rationale of *Edler* was not affected by the enactment of section 1041, and the case is still the law of the Court of Appeals for the Ninth Circuit, to which this case is appealable.

This conclusion is further supported by respondent's own published position in Rev. Rul. 69–608, 1969–2 C.B. 42, 44. Situation 5 states:

A and B owned all of the outstanding stock of X corporation. An agreement between A and B provided that upon the death of either, X will redeem all of the X stock owned by the decedent at the time of his death. In the event that X does not redeem the shares from the estate, the agreement provided that the surviving shareholder would purchase the unredeemed shares from the decedent's estate. B died and, in accordance with the agreement, X redeemed all of the shares owned by his estate.

In this case A was only secondarily liable under the agreement between A and B. Since A was not primarily obligated to purchase the X stock from the estate of B, he received no constructive distribution when X redeemed the stock.

This scenario is directly analogous to the case before us. Indeed, petitioner argues on brief that, in structuring the redemption of Joann's Moriah stock, he had the right to rely on *Edler v. Commissioner, supra*, and Rev. Rul. 69–608, 1969–2 C.B. at 43, situation 5. See *Estate of Henry v. Commissioner*, 69 T.C. 665, 674–675 (1978). Petitioner and Joann owned all of the stock of Moriah. Their property settle-

ment agreement provided that Moriah would redeem Joann's shares, with Moriah's obligation guaranteed by petitioner. Under applicable Washington State law, the property settlement agreement created at most a secondary obligation, which could only mature on Moriah's default on its primary obligation. See *National Bank of Washington v. Equity Investors*, 81 Wash. 2d 886, 917, 506 P.2d 20, 39 (1973); *Amick v. Baugh*, 66 Wash. 2d 298, 303–308, 402 P.2d 342, 345–348 (1965). The McDonald's letter did not create a primary and unconditional obligation on petitioner to acquire Joann's shares.[2] Because petitioner was not primarily obligated to purchase Joann's shares, he received no constructive distribution when Moriah redeemed the stock.

Respondent contends, under the principle of *Golsen v. Commissioner*, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971), that the following statement by the Court of Appeals for the Ninth Circuit in *Arnes v. United States*, 981 F.2d at 459, controls our decision in the instant case:

John Arnes had an obligation to Joann Arnes that was relieved by Moriah's payment to Joann. That obligation was based in their divorce property settlement, which called for the redemption of Joann's stock. Although John and Joann were the sole stockholders in Moriah, the obligation to purchase Joann's stock was John's, not Moriah's. Furthermore, John personally guaranteed Moriah's note to Joann. Under Washington law, Joann could sue John for payment without suing Moriah. *See* Wash. Rev. Code Ann. § 62A.3–416(1) (West 1979). Thus, John was liable, with Moriah, for the payments due Joann.

*Golsen v. Commissioner, supra*, does not apply because *Arnes v. United States, supra*, does not address the legal issue here: whether there is a constructive dividend to petitioner. That case concerned the tax consequences to Joann under section 1041. *Bonaire Dev. Co. v. Commissioner*, 76 T.C. 789, 799–801 (1981), affd. on other grounds 679 F.2d 159 (9th Cir. 1982); *Estate of Henry v. Commissioner*, 69 T.C. 665, 674 (1978). We note that petitioner was not a party in *Arnes*, and Joann had a possibly[3] adverse position to petitioner in that case.

---

[2] The McDonald's letter did not mandate the manner in which ownership of the franchise had to be redistributed or even to whom it had to be redistributed.

[3] This majority opinion does not express an opinion as to whether the standard of "on behalf of" the spouse in sec. 1.1041–1T(c), Q&A–9, Temporary Income Tax Regs., 49 Fed. Reg. 34453 (Aug. 31, 1984), is the same as the primary and unconditional obligation rule applicable to a

Moreover, petitioner's guarantee did not create a primary and unconditional obligation. Under Wash. Rev. Code Ann. sec. 62A.3–416(1) (West 1979), cited by the Court of Appeals for the Ninth Circuit, any obligation[4] of petitioner would arise only after Moriah failed to make payments to Joann.[5] Any obligation of petitioner implied in the property settlement agreement would be the same as would exist in any situation involving a divorce and a division of property and as existed in *Edler v. Commissioner*, 727 F.2d 857 (9th Cir. 1984), affg. T.C. Memo. 1982–67, after the nunc pro tunc modification. To the extent this is suggested by the Court of Appeals for the Ninth Circuit in *Arnes v. United States, supra*, we conclude that the obligation is not primary and unconditional, and the statement constitutes dictum.

Applying these standards to the record as a whole, and the undisputed facts therein, we conclude that petitioner demonstrated that there is no genuine issue of material fact that could establish that payments made by Moriah to Joann in redemption of her stock were constructive distributions by Moriah to petitioner that could properly be treated as dividends to him.

In hindsight, tactically, it might have been preferable if respondent had taken action to facilitate simultaneous consideration of petitioner's and Joann's cases by the Court of Appeals for the Ninth Circuit, instead of the course that was taken.

Petitioner's motion for partial summary judgment will be granted. In view of our above conclusions, respondent's motion for summary judgment will be denied in full. To reflect the foregoing,

*An appropriate order will be issued.*

---

constructive dividend. Suffice it to say that our conclusion in this case is consistent with our conclusion in *Blatt v. Commissioner*, 102 T.C. 77 (1994), also a Court-reviewed opinion.

[4] Under Washington State law, assuming facts most favorable to respondent, petitioner's guarantee would be classified as an absolute guarantee. An absolute guarantee constitutes a promise to pay on default by the principal obligor. *National Bank of Washington v. Equity Investors*, 81 Wash. 2d 886, 917, 506 P.2d 20, 39 (1973); *Amick v. Baugh*, 66 Wash. 2d 298, 303–308, 402 P.2d 342, 345–348 (1965).

[5] Indeed, Joann was paid to the extent of $110,983.56 on the cancellation of her note to Moriah; any obligation of petitioner under his guarantee would never arise to that extent.

Reviewed by the Court.

HAMBLEN, CHABOT, COHEN, WRIGHT, WELLS, BEGHE, CHIECHI, and LARO, *JJ.*, agree with this majority opinion.

PARR, *J.*, concurs in the result only.

---

HAMBLEN, *C.J.*, concurring: I agree not only with the majority opinion, but also with Judge Chiechi's concurring opinion and with that part of Judge Beghe's concurring opinion that relates to the historical and policy reasons for leaving preexisting redemption tax law intact.

WRIGHT and WELLS, *JJ.*, agree with this concurring opinion.

---

BEGHE, *J.*, concurring: Having joined the majority opinion, I write separately to extend my comments in *Blatt v. Commissioner*, 102 T.C. 77, 86 (1994) (Beghe, J., concurring), on the benefits of consolidation, and to address the dissents.

1. *Respondent's Role as Stakeholder*

Of course, it's proper to select a test case and let it go forward because it will be instructive or dispositive as to the identical or similar case or cases that are postponed pending its outcome. But when, as in this case, the parties to a transaction have opposing tax interests, respondent has the institutional obligation, subject to the Court's needs for efficient case management and sound judicial administration, to facilitate consolidation of their cases. Postponing one case while the other goes forward creates an unacceptable risk of depriving the postponed party of his day in court (or in this case, of a meaningful appeal) if he will be foreclosed by the final decision in the case that goes forward.[1] In addition, if the cases are consolidated, respondent can properly communicate to the Court respondent's views on how the generic situation should be handled.

Joann's and John's cases provide an instructive example of lost opportunities. This Court missed the last clear chance in 1992 to put John's summary judgment motion on a fast

---

[1] This is particularly true in the case at hand. It is understood that John's motion, in the appeal of Joann's case, to intervene or for leave to file an amicus brief, was denied.

track, so that his case could catch up with Joann's case coming up from the District Court, and both appeals considered on a consolidated basis by the Court of Appeals for the Ninth Circuit. However, our mistake in agreeing with respondent's arguments for postponement of John's case doesn't mean it's too late for us to try to rectify the situation, insofar as John is concerned. In view of respondent's successful efforts to prevent the appeals in the two cases from being consolidated, the resulting whipsaw is of respondent's own making.

## 2. *The Case at Hand*

As summarized in Judge Ruwe's peroration (*infra* p. 549):

> The result we reach today directly contradicts the holding of the Court of Appeals to which the instant case is appealable [thereby failing to follow our rule in *Golsen v. Commissioner*, 54 T.C. 742, 757 (1970), affd. 445 F.2d 985 (10th Cir. 1971)], fails to explain why we disagree with the Court of Appeals [thereby perpetuating our failure in *Blatt v. Commissioner*, 102 T.C. 77 (1994), to explain our disagreement with the Ninth Circuit], and produces an untenable result in that neither of the two stockholders of Moriah will incur any tax consequences as a result of the $450,000 stock redemption [thus allowing respondent to be whipsawed]. [Bracketed comments added.]

To each of these arguments I now turn, responding, in passing, to Judge Halpern's conclusion that "it is illogical to think that the Court of Appeals will not reverse us" (*infra* p. 549).

a. *The Golsen question.* This Court recently revisited the *Golsen* doctrine and explained, in our reviewed opinion in *Lardas v. Commissioner*, 99 T.C. 490, 493–498 (1992), the limitations on its application. Although "better judicial administration requires us to follow a Court of Appeals decision which is squarely in point where appeal from our decision lies to that Court of Appeals and to that court alone", *Golsen v. Commissioner*, 54 T.C. 742, 757 (1970) (fn. refs. omitted), affd. 445 F.2d 985 (10th Cir. 1971), we need not do so where "it is not clear that the Ninth Circuit would disagree with our conclusion" and "Accordingly * * * we are obliged to decide this case as we think right", *Lardas v. Commissioner, supra* at 498.

I do not think it is as clear as Judges Ruwe and Halpern do that the Court of Appeals for the Ninth Circuit will reverse us. The briefs filed with the Court of Appeals in

Joann's case, *Arnes v. United States*, 981 F.2d 456 (9th Cir. 1992), affg. 91–1 USTC par. 50,207 (W.D. Wash. 1991), did not bring *Edler v. Commissioner*, 727 F.2d 857 (9th Cir. 1984), affg. T.C. Memo. 1982–67, to the attention of the Court of Appeals. The Court of Appeals should take the opportunity to revisit the redemption situation in the light of *Edler*. In addition, the procedural anomaly created by the delay in getting John's case to the Court of Appeals should lead it not only to review our decision in John's case de novo, but also to reconsider the views expressed by its panel in Joann's case. In these unusual circumstances, I agree with Judge Chiechi that judicial efficiency considerations do not dictate our application of the *Golsen* doctrine in John's case. Cf. *Of Course, Inc. v. Commissioner*, 499 F.2d 754 (4th Cir. 1974), revg. 59 T.C. 146 (1972).

In arguing that it's not clear how the Court of Appeals for the Ninth Circuit will decide the appeal of our decision in John's case, I won't try to make life easy for myself by arguing that a proper application of the tax laws in Joann's and John's cases, or in the generic situation, would be for both spouses (or ex-spouses) to escape tax. But, because the Court of Appeals opinion might be read as leaving open the possibility of this result, I'll try, as a preliminary matter, to lay it to rest. The focus of section 1041 is on the nonrecognition and deferral of gain on the transfers of appreciated property between spouses. Although section 1041 says nothing about transactions with third parties, it did not repeal the rule of *Moline Properties, Inc. v. Commissioner*, 319 U.S. 436 (1943), that, in the absence of applicable sham or agency principles, the corporate entity must be regarded as separate from that of the shareholders.[2]

Section 1041 is a rule of nonrecognition and deferral of gain or loss on transfers of property between spouses (and ex-spouses pursuant to divorce decree or separation agreement). It does not immunize dividends—described by sections

---

[2] Sec. 1.1041–1T(a), Q&A–2, Temporary Income Tax Regs., 49 Fed. Reg. 34453 (Aug. 31, 1984), is in agreement:

Assume the same facts as in example (2) [A's sole proprietorship X Company sells property to B in ordinary course of business; transfer entitled to nonrecognition under sec. 1041], except that X Company is a corporation wholly owned by A. This sale is not a sale between spouses subject to the rules of section 1041. However, in appropriate circumstances, general tax principles, including the step-transaction doctrine, may be applicable in recharacterizing the transaction.

301 and 316 as distributions by a corporation out of earnings and profits with respect to stock—from taxation by providing that they are to be excluded from gross income. To allow both spouses to escape tax in the generic redemption situation would allow cash representing earnings and profits to be removed from corporate solution at no tax cost whatsoever, either currently or in the future.[3] This would violate the deferral principle of section 1041.

To allow both spouses to escape tax in the generic redemption situation (of which this case is an example) would overextend the acknowledged purpose of section 1041 to repeal the rule of *United States v. Davis*, 370 U.S. 65 (1962), that a divorce-related transfer of appreciated property in exchange for the release of marital claims resulted in recognition of gain to the transferor. H. Rept. 98–432, at 1491–1492 (1984); Staff of Joint Comm. on Taxation, General Explanation of the Deficit Reduction Act of 1984, at 710 (J. Comm. Print 1985). The *Davis* rule caused unjust results and impeded divorce-actuated transfers of appreciated property because the transferor spouse was taxed on the transfer—without receiving any cash with which to pay the tax—and the transferee spouse received the property with an unpaid-for step-up in basis. The redemption situation does not present this problem; the spouse whose stock is redeemed receives cash, which provides the wherewithal to pay the tax, and this points the way to the proper treatment of the case at hand.

b. *Our disagreements with the Ninth Circuit.* The reasons for our decision in this case can be explicated by at least

---

[3] That allowing both spouses to escape tax on the redemption would result in permanent tax avoidance rather than deferral can be demonstrated by a simple example. Suppose, as in our case, that Moriah has the same value of $900,000 and that Joann receives a lump-sum payment of $450,000 in exchange for her stock. But also assume that the stock basis of each shareholder is $250,000, rather than $2,500. If John takes a carryover basis for the stock received from Joann that is canceled by the corporation, he is left with a corporation worth $450,000, and a $500,000 basis for his stock (this would not be a redemption and sec. 301 distribution in which the "mystery of the disappearing basis" would present a problem; see Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders, par. 9.22[2], at 9–88 (6th ed. 1994)). If John should promptly thereafter liquidate Moriah, he would have a capital loss of $50,000, and it would be clear that the cash previously paid by Moriah out of its earnings and profits to Joann would have completely escaped individual income taxation. Even if the shareholders had had the low $2,500 basis for their shares ($5,000 in the aggregate), the $445,000 gain that John would realize and recognize on his liquidation of the corporation would be a gain with respect to his remaining interest in the corporation (albeit reduced by the addition of Joann's stock basis to his stock basis), and the cash used to pay for Joann's stock would have completely escaped individual income taxation.

three lines of argument, none of which appears to have been previously expressed in its application to this case: First, a reminder about the self-acknowledged limitations on the applicability of Q&A–9 of the temporary regulation to this case and the generic redemption situation; second, a revisit to the location of the primary obligation to purchase Joann's stock, as between John and Moriah; and third, a historical and policy analysis of the common law of taxation applicable to stock redemptions of closely held corporations.

(i) *Limitations of the temporary regulation.* The format and preamble of the temporary regulation, sec. 1.1041–1T, Temporary Income Tax Regs., 49 Fed. Reg. 34452 (Aug. 31, 1984), make clear that it does not assert that section 1041 repealed the preexisting and continuing tax common law on the treatment of redemptions of family corporations. The question and answer format and the "Temporary" label alert us that the temporary regulation was not and is not intended to be the Treasury's comprehensive last word on the subject. The preamble to the temporary regulation, also set forth at T.D. 7973, 1984–2 C.B. 170, states that the "document provides temporary regulations relating to the treatment of transfers of property between spouses or former spouses" and is

presented in the form of questions and answers * * * [that] are not intended to address comprehensively the issues raised by sections 1041, 71, 215 and 152(e). Taxpayers may rely for guidance on these questions and answers, which the Internal Revenue Service will follow in resolving issues arising under sections 1041, 71, 215 and 152(e). No inference, however, should be drawn regarding questions not expressly raised and answered.

Even though a temporary regulation has the same dignity as any other interpretative regulation on the subject that is fairly within its ambit, see *Nissho Iwai American Corp. v. Commissioner,* 89 T.C. 765, 776 (1987), its temporary character also tells us that it should not be extended by implication beyond the area with which it purports to deal.

(ii) *Locating the obligation.* It would appear that the Court of Appeals for the Ninth Circuit concluded in Joann's case— because a separation agreement is clearly an agreement between the spouses and because a divorce decree is primarily directed to them—that such an agreement or decree

necessarily imposes the primary obligation on the remaining shareholder spouse to see to it that the corporation pays the terminating shareholder spouse in exchange for its redemption purchase of her stock. That is obviously the basis for the characterization of the first situation in Q&A–9, 49 Fed. Reg. 34453, "where the transfer to the third party is required by a divorce or separation instrument," as being "on behalf of" the nontransferring spouse, so that the nontransferring spouse will necessarily be treated as first receiving the property from the transferor spouse and then transferring it to the third party.[4]

That would be a plausible approach if section 1041 had been enacted in a vacuum or written on a clean slate. But our task is to harmonize or reconcile section 1041 with a preexisting and continuing body of law on the tax treatment of redemptions by closely held corporations. We therefore must decide where the line of demarcation should be drawn between them. For the reasons set forth (*infra* pp. 538–541), the line should be drawn differently from the way in which application of Q&A–9 to the family corporation redemption situation might at first blush seem to require.

The Court of Appeals for the Ninth Circuit concluded in Joann's case, *Arnes v. United States, supra* at 459, that John had an obligation to Joann "that was relieved by Moriah's payment to Joann" that "was based in their divorce property settlement, which called for the redemption of Joann's stock" and that "Although John and Joann were the sole stockholders in Moriah, the obligation to purchase Joann's stock was John's, not Moriah's." The ground for these conclusions is not

---

[4] As a technical matter, a separation agreement or divorce decree that requires the corporation to redeem the stock of one shareholder need not thereby be deemed to impose on the remaining shareholder the primary obligation to buy the stock. On more than one occasion, a shareholder obligated to pay for shares has been able to establish that he was acting as agent for the corporation, so that the redemption was treated as a payment by the corporation of its own obligation, rather than that of the shareholder. See *Fox v. Harrison*, 145 F.2d 521 (7th Cir. 1944); *Decker v. Commissioner*, 32 T.C. 326 (1959), affd. 286 F.2d 427 (6th Cir. 1960); *Ciaio v. Commissioner*, 47 T.C. 447 (1967); *Peterson v. Commissioner*, T.C. Memo. 1964–15; *State Pipe & Nipple Corp. v. Commissioner*, T.C. Memo. 1983–339; see also Rev. Rul. 80–240, 1980–2 C.B. 116. But see *Glacier State Elec. Supply Co. v. Commissioner*, 80 T.C. 1047 (1983).

*Schroeder v. Commissioner*, 831 F.2d 856 (9th Cir. 1987), affg. *Skyline Memorial Gardens, Inc. v. Commissioner*, T.C. Memo. 1985–334, relied on by the Ninth Circuit Court of Appeals in *Arnes v. United States*, 981 F.2d 456, 459 (9th Cir. 1992), was clearly distinguishable therefrom. In *Schroeder*, the Court of Appeals stated:

At the time that the taxpayer [Schroeder] borrowed the money from the bank, he owned no part of the corporation and had no authority to act on behalf of the corporation. See *id.* at 859–60 & n.7. [*Schroeder v. Commissioner, supra* at 859.]

stated in the opinion of the Court of Appeals, but it may have been an interpretation and application of Q&A–9 to the effect that a transfer of property by a spouse to a third party pursuant to a separation agreement or divorce decree must in all circumstances be deemed to be "on behalf of" the nontransferring spouse.

Although, as Judge Ruwe states (*infra* p. 547), the Court of Appeals was "cognizant of Washington State law", I do not believe that it necessarily relied on the State law in deciding Joann's case. The Court of Appeals' citation of Wash. Rev. Code Ann. sec. 62A.3–416(1) (West 1979) concerns only the State law question of the effect of the guarantee, which is an afterthought and a makeweight.[5]

The ground of the Court of Appeals' decision in Joann's case appears to have been a conclusion about Federal tax law, based on Q&A–9, that a transfer to a third party, pursuant to a separation agreement or divorce decree, must be "on behalf of" the nontransferring spouse or ex-spouse.[6] As a result, Q&A–9 of the temporary regulation appears to have been extended beyond its proper purview in the redemption context.

I believe that this is where the Tax Court has parted company with the Ninth Circuit Court of Appeals panel that decided Joann's case. See *Blatt v. Commissioner*, 102 T.C. 77, 82–83 (1994). The Court of Appeals should have the opportunity to revisit the question in the context of the

---

[5] I agree with our majority opinion that the provision of Washington law cited by the Ninth Circuit, and the cases construing it cited by the majority (majority op. p. 530 note 4), support the view that the guarantor's obligation is not primary and unconditional, notwithstanding that the breach by the corporation would entitle the wife to sue the ex-husband directly without vouching in the defaulting corporation. Until the breach by the corporation, it would be the corporation that had the primary obligation to redeem the wife's stock and to make payments to her in accordance with the redemption agreement. However, I wouldn't get too tangled in the vagaries of State law. The legislative history of sec. 1041 instructs us that "uniform Federal income tax consequences will apply to these transfers notwithstanding that the property may be subject to differing state property laws." H. Rept. 98–432 (Part II), at 1492 (1984); Staff of Joint Comm. on Taxation, General Explanation of the Deficit Reduction Act of 1984, at 710 (J. Comm. Print 1985).

[6] This is indicated by the Ninth Circuit's reliance in *Arnes v. United States, supra* at 459, on *Schroeder v. Commissioner*, 831 F.2d 856, 859 (9th Cir. 1987), and its rejection of the Government's argument that Joann's situation was governed by *Holsey v. Commissioner*, 258 F.2d 865 (3d Cir. 1958), which would have let John off the hook. As Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders, par. 9.06[6], at 9–44 n.206 (6th ed. 1994), note, *Schroeder* was similar in facts and result to *Wall v. United States*, 164 F.2d 462 (4th Cir. 1947), the primordial case establishing that a remaining or incoming shareholder whose obligation to purchase and pay for the stock of another shareholder is discharged by the subject corporation will be considered to have received a dividend.

nontransferring spouse's tax treatment with the benefit, such as it may be, of our analysis, and the opportunity to reconcile its decision in Joann's case with its prior decision in *Edler v. Commissioner*, 727 F.2d 857 (9th Cir. 1984), affg. T.C. Memo. 1982–67.

(iii) *Historical and policy reasons for leaving preexisting redemption tax law intact.* In the absence of any showing that Congress, in enacting section 1041, or the Treasury, in promulgating the temporary regulation, intended to displace the tax common law on redemptions of closely held corporations, that law should remain in place. The way to accomplish this result is to interpret section 1041 and the temporary regulation so that no redemption of one spouse will be considered to be "on behalf of" the remaining spouse unless it discharges that spouse's primary and unconditional obligation to purchase the subject stock, as summarized and set forth in the examples in Rev. Rul. 69–608, 1969–2 C.B. 42, and the case law on which it relies. *Blatt v. Commissioner, supra* at 85 (Beghe, J., concurring).

Although the tax treatment of continuing shareholders is not specifically set forth in the Code, the bright line is well established by court decisions, such as *Wall v. United States*, 164 F.2d 462 (4th Cir. 1947), and *Holsey v. Commissioner*, 258 F.2d 865 (3d Cir. 1958), and by administrative rulings, such as Rev. Rul. 69–608, *supra*. A nonredeeming shareholder realizes no gain or loss or dividend income solely because all or a portion of the stock of another shareholder was redeemed, even though the effect of the redemption is to increase his percentage ownership in the corporation. The line has been drawn in terms of whether the remaining shareholder blundered into incurring a direct and primary obligation to purchase the stock, which he belatedly attempts to shift to the corporation, as in *Wall v. United States, supra*, and *Schroeder v. Commissioner*, 831 F.2d 856 (9th Cir. 1987). [7]

These longstanding rules amount to a "social compact" that contemplates a pattern in which, when one shareholder or

---

[7] Even in *Edler v. Commissioner*, 727 F.2d 857 (9th Cir. 1984), the remaining shareholder husband appears to have been saved from dividend treatment by the fact that respondent had been dilatory in objecting that the nunc pro tunc extinction of that obligation by a second divorce decree was ineffective for Federal income tax purposes. Cf. *Hayes v. Commissioner*, 101 T.C. 593 (1993).

group of shareholders withdraws from the corporation, wholly or partly, with a resulting increase in the percentage ownership of the remaining shareholder, the remaining shareholder will not be taxed. The withdrawing shareholder is treated as having sold or exchanged a capital asset, while the remaining shareholder is considered to have realized nothing that can be viewed as a taxable gain or dividend. Although the withdrawal and shift in interest is financed out of the corporate treasury rather than individual bank accounts, and may be viewed as conferring an indirect benefit on the remaining shareholder, the transaction is considered no more than a sale to the corporation by the holder whose stock interest is terminated or substantially reduced.

All this was persuasively set forth 25 years ago in an article by Professor Chirelstein. He argued, although the Commissioner has never officially espoused his view, that publicly held corporations that engage in share repurchase plans should be considered as distributing dividends to their shareholders because such plans in effect give the shareholders the option to take stock or cash. Cf. *Technalysis Corp. v. Commissioner*, 101 T.C. 397 (1993). In making this argument, however, Professor Chirelstein was careful to make clear that there was no historical or policy basis for changing the tax treatment of redemptions of closely held corporations, which treatment was inherent in the structure of section 302:

These results must be considered among the basic structural elements of Subchapter C and are no longer open to any fundamental challenge. * * *

\* \* \* \* \* \* \*

Section 302 was designed with a specific policy goal in mind and not simply to carry out general principles relating to the tax treatment of stock sales. Most would agree that the aim of the section is to facilitate occasional, and often major, shifts in ownership interests among the shareholders of closely-held or family-owned corporations for whose shares no active market exists apart from the company itself. That, of course, is the image of Section 302 which tax lawyers generally have in mind; virtually every technical detail in the section confirms that Congress did as well. Thus, family attribution rules and other provisions for constructive ownership of stock, restrictions relating to the redemption of stock from controlling shareholders, the disproportionality standard itself together with the prohibition against planned series of redemptions which are pro rata in the aggregate—these rules obviously contemplate a tightly knit shareholder group whose individual interests are virtually identical to those of the cor-

poration. * * * The basic legislative aim * * * is to bear lightly on withdrawals from incorporated partnerships.

Transactions of the latter sort, though perhaps formally initiated by the corporation, are necessarily the product of negotiation and agreement among the shareholders. That is their distinguishing mark. Redemption price, terms of payment, total number of shares to be redeemed, *even the tax consequences*, must be bargained out and agreed to before the redemption is authorized. The reason, of course, is that the redemption is intended to alter the stock interests of particular individuals in specified ways—for example, through the surrender of control by one partner to another, through the retirement of older family members, or on the occasion of the death or resignation of an executive holding shares in the firm. The chief technical features of Section 302 confirm that the section contemplates an advance understanding or agreement by the shareholders. * * * These provisions were developed to permit and encourage taxpayers to act in relatively certain reliance on their applicability in a given case, and it is clear that they contemplate effective planning based on more or less formal agreement among the shareholders as to who will and who will not present his [or her] shares for redemption. * * *

[Chirelstein, "Optional Redemptions and Optional Dividends: Taxing the Repurchase of Common Shares", 78 Yale L. J. 739, 749, 750 (1969); emphasis added.]

It is obvious that John and his counsel and Joann and her counsel negotiated the separation agreement to have Joann's stock redeemed against the background of and in reliance on these rules. Joann originally reported the redemption transaction as resulting in capital gains to her, in accordance with the advice of the attorney who represented her in the negotiation of the separation agreement. She then changed her mind and claimed a refund in repudiation of the original agreement. John's counsel demonstrated on brief, and respondent did not disagree, that the separation agreement was based on the assumption that the community property and liabilities would be equally divided between John and Joann. In agreeing on that equal division, the parties assumed that Joann would bear capital gains taxes on the Moriah distributions that she would receive as payment in exchange for her stock, and that there would be no tax on John. The net effect of taxing John and exonerating Joann is that she would receive and retain more than twice as much of the community property as John.

One of the benefits of having these bright line rules apply to redemptions by family corporations is that they reduce the opportunities for tax game playing between private parties.

It is game playing, and engaging in second thoughts, that Joann, with the assistance of counsel, indulged in when she sandbagged John by reneging on their original deal.

The tax commentators have been alert to spot the opportunities for game playing that the decision in Joann's case has created. The most recent comment in this area states: [8]

> Recent cases involving the redemption of stock in husband-wife corporations make it clear that even though section 1041 has brought greater ability to specify the tax consequences of divorce, it has not put to rest all uncertainty. Tax practitioners still face a grey area when they are trying to predict when a stock redemption from one spouse will be held to be made "on behalf of" the other spouse. In that context, there are opportunities to take aggressive filing positions—and, in a planning context, to document the divorce transactions to either dictate a specific tax result *or create ambiguity*. [Raby, "Raby Revisits Stock Redemptions Incident to Divorce," Tax Notes 1031–1032 (Feb. 21, 1994); emphasis added.]

Hewing to the bright line rules of Rev. Rul. 69–608, *supra*, in the marital dissolution context will reduce the tax costs of divorce for the owners of small businesses held and operated in corporate form. If the shareholder spouses can negotiate their separation agreement with the assurance that the redemption will be tax free to the remaining shareholder and a capital gain transaction to the terminating shareholder, the overall tax costs will ordinarily be less than if the terminating spouse qualifies for nonrecognition under section 1041, but the remaining spouse suffers a dividend tax. [9] This will leave a bigger pie to be divided in setting the consideration for the shares to be redeemed.

c. *The whipsaw*. Judge Ruwe concludes that our decision produces "an untenable result in that neither of the two stockholders of Moriah will incur any tax consequences as a result of the $450,000 stock redemption" (*infra* p. 549). I join Judge Ruwe and his cohort in deploring the whipsaw result,

---

[8] See also Raby, "If He Gets the Big Mac, Does She Pay the Tax?", Tax Notes 347 (Jan. 17, 1994); Preston & Hart, "Spouse's Stock in a Divorce Can Be Redeemed Tax Free", 78 J. Taxn. 360 (1993); Raby, "A Tale of Two Redemptions: It Was the Best and Worst (of Tax Consequences)", Tax Notes 459 (Jan. 25, 1993).

[9] This seems even more likely to be so with the restoration, by the Revenue Reconciliation Act of 1993, of a substantial differential in the rates of individual income tax on ordinary income and long-term capital gain.

but it's of respondent's own making.[10] The right lessons to be learned from these cases will best be imparted to all concerned by upholding the result arrived at by our majority opinion in John's case. I hope and expect that the Court of Appeals for the Ninth Circuit will agree.

FAY, *J.*, agrees with this concurring opinion.

---

CHIECHI, *J.*, concurring: Although I join the majority opinion, I write separately to explain why I believe the extension of the principle of *Golsen v. Commissioner*, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971), called for in the dissents does not serve the purpose for which this Court adopted that principle and therefore is not warranted in the present case. In *Lardas v. Commissioner*, 99 T.C. 490, 495 (1992), we recently had occasion to review that purpose. There, we stated:

> It should be emphasized that the logic behind the *Golsen* doctrine is not that we lack the authority to render a decision inconsistent with any Court of Appeals (including the one to which an appeal would lie), but that it would be futile and wasteful to do so where we would surely be reversed. Accordingly, bearing in mind our obligation as a national court * * * we should be careful to apply the *Golsen* doctrine only under circumstances where the holding of the Court of Appeals is squarely on point. * * *

In my view, the majority opinion is not a futile and wasteful insistence of this Court's view as to whether petitioner (John) received a constructive dividend as a result of the redemption by a corporation of the stock of his former spouse (Joann). While it is a virtual certainty that respondent will appeal our holding that John did not receive a constructive dividend to the U.S. Court of Appeals for the Ninth Circuit, it is just as certain that petitioner would have appealed if the dissents had been adopted. What is by no means certain, in my opinion, is the outcome on appeal, since the legal issue in *Arnes v. United States*, 981 F.2d 456 (9th Cir. 1992), was

---

[10] There are other ways by which respondent could reduce the opportunities for game playing that resulted in the whipsaw in this case. One would be to persuade Congress to enact a statutory provision, similar to sec. 1060 on special allocation rules for certain asset acquisitions, that would assure consistent tax treatment by the private parties of this type of transaction. Another would be to get around to replacing the "temporary regulation", published Aug. 31, 1984, in the Federal Register (see *supra* p. 535), or at least issuing a revenue ruling supplementing Rev. Rul. 69–608, 1969–2 C.B. 42, that would set forth clearly respondent's view on how stock redemptions by family corporations should be treated in the marital dissolution context.

the application of section 1041 to Joann, and not whether John received a constructive dividend, the legal issue presented here. In these circumstances, I do not believe we should extend the principle of *Golsen v. Commissioner, supra,* to the instant proceeding.

HAMBLEN, FAY, CHABOT, COHEN, WRIGHT, and COLVIN, *JJ.,* agree with this concurring opinion.

---

RUWE, *J.,* dissenting: I disagree with the majority because I believe that the Court of Appeals for the Ninth Circuit, to which this case is appealable, has already passed on the determinative legal issue. In *Arnes v. United States,* 981 F.2d 456 (9th Cir. 1992), the Court of Appeals considered the same transaction that is presently before us.

The ultimate issue in *Arnes* was whether section 1041 shielded Mrs. Arnes (Joann) from recognizing gain when a corporation (Moriah), in which she and her husband (John) owned stock, redeemed her shares as part of a divorce settlement. Section 1041 generally provides that no gain or loss shall be recognized on a transfer of property from an individual to a spouse or former spouse incident to a divorce. Section 1041 does not apply to transfers to third parties. However, section 1.1041–1T, Q&A–9, Temporary Income Tax Regs., 49 Fed. Reg. 34453 (Aug. 31, 1984), asks the following question: "May transfers of property to third parties *on behalf of* a spouse (or former spouse) qualify under section 1041?" (Emphasis added.) The question assumes the fact that the transfer to the third party was "on behalf of" the nontransferring spouse. The answer in the temporary regulation also assumes this, stating: "Yes. There are three situations in which a transfer to a third party on behalf of a spouse (or former spouse) will qualify under section 1041". One of those situations is where the transfer was required by a divorce or separation agreement.

It is clear from the regulation and the opinion of the Court of Appeals in *Arnes v. United States, supra,* that not every transfer from one spouse to a third party, pursuant to a divorce, will qualify for nonrecognition under section 1041. Rather, only those made "on behalf of" the nontransferring spouse can qualify. As explained by the Court of Appeals:

The regulation explains that in certain cases a transfer of property to a third party "on behalf of" a spouse or former spouse should be treated as a transfer to the spouse or former spouse. *Id.* at Q–9, A–9. One example supplied in the regulation is the case where the transfer to the third party is required by a divorce or separation instrument. Such a transfer of property

will be treated as made directly to the nontransferring spouse (or former spouse) and the nontransferring spouse will be treated as immediately transferring the property to the third party. The deemed transfer from the nontransferring spouse (or former spouse) to the third party is not a transaction that qualifies for nonrecognition of gain under section 1041.
Temp. Treas. Reg. §1.1041–1T, A–9 (1992).

The example suggests that the tax consequences of any gain or loss arising from the transaction would fall upon the nontransferring spouse for whose benefit the transfer was made, rather than upon the transferring spouse. Consistent with the policy of the statute, which is to defer recognition until the property is conveyed to a party outside the marital unit, the regulation seems to provide for shifting the tax burden from one spouse to the other, where appropriate.

Thus, a transfer by a spouse to a third party can be treated as a transfer to the other spouse when it is "on behalf of" the other spouse. Whether the redemption of Joann's stock can be construed as a transfer to John, pursuant to the regulation example in A–9, depends upon the meaning of "on behalf of." * * *

[*Arnes v. United States, supra* at 458–459.]

The temporary regulation gives no guidance as to the criteria for determining when such a transfer will be deemed to be "on behalf of" the nontransferring spouse. Acknowledging that there were no cases directly on point, the Court of Appeals analyzed whether Moriah's redemption of Joann's stock was on behalf of John by looking to the established legal precedents concerning constructive dividends. The Court of Appeals observed that

Generally, a transfer is considered to have been made "on behalf of" someone if it satisfied an obligation or a liability of that person. If an employer pays an employee's income tax, that payment is income to the employee. *See Old Colony Trust Co. v. Commissioner*, 279 U.S. 716, 729–31, 49 S.Ct. 499, 504, 73 L.Ed. 918 (1929). If a corporation assumes a shareholder's bank note in exchange for stock, the shareholder receives a taxable constructive dividend.[1] *Schroeder v. Commissioner*, 831 F.2d 856, 859 (9th Cir. 1987). [*Id.* at 459.]

---

[1] This is identical to what we recently stated in *Hayes v. Commissioner*, 101 T.C. 593, 599 (1993):

A shareholder also receives a constructive dividend to the extent of available earnings and profits when a corporation agrees to perform that shareholder's obligation and that shareholder's obligation is thereby extinguished. See *Maher v. Commissioner*, 469 F.2d 225, 229 (8th Cir.

The Court of Appeals went on to explain that its holding in *Schroeder* that the taxpayer had received a constructive dividend, was based on its conclusion that "The taxpayer had the *primary obligation* to repay the loan, and the corporation's assumption of the loan relieved the taxpayer of that obligation." *Arnes v. United States, supra* at 459 (emphasis added).

The majority has expressed no disagreement with the Court of Appeals' use of constructive dividend principles for determining that Joann's transfer to Moriah was "on behalf of" John,[2] and the Court of Appeals' articulation of those principles is consistent with those stated by the majority. I recognize that the majority opinion in *Blatt v. Commissioner*, 102 T.C. 77, 82 (1994), stated that "we do not agree with *Arnes* and respectfully refuse to follow it." Unfortunately, the majority opinion in *Blatt* failed to give any reasons for its disagreement with the Court of Appeals. *Id.* at 84–85 (Halpern, *J.*, concurring), 85–86 (Beghe, *J.*, concurring). Indeed, as pointed out in Judge Chiechi's concurrence in *Blatt v. Commissioner, supra* at 86, it seems to have been totally unnecessary to announce a disagreement with *Arnes v. United States, supra*.[3]

It appears to me that the *Blatt* majority's real disagreement was with the District Court's opinion in *Arnes* where the District Court indicated that Moriah's redemption of Joann's stock would be considered to be "on behalf of" John if he received "any benefit". See *Blatt v. Commissioner, supra* at 84 (Halpern, J., concurring), 85 (Beghe, J., concurring). However, the opinion of the Court of Appeals in *Arnes* was based on its de novo review of the facts and law. *Arnes v. United States, supra* at 458. The Court of Appeals' opinion

---

1972), affg. in part, revg. and remanding on another issue 55 T.C. 441 (1970); *Sullivan v. United States, supra* at 728 n.5. * * *

[2] Curiously, the majority states that it "does not express an opinion as to whether the standard of 'on behalf of' the spouse in sec. 1.1041–1T(c), Q&A–9, * * * is the same as the primary and unconditional obligation rule applicable to a constructive dividend." Majority op. pp. 529–530 note 3.

[3] In *Blatt v. Commissioner*, 102 T.C. 77, 83 (1994), the majority acknowledged that

the facts in *Arnes* are easily distinguishable from the facts at hand. First, in *Arnes*, the Court of Appeals stated that McDonald's Corp. required complete ownership of a franchise by an owner/operator after the divorce; no such requirement is present here with respect to ownership of corporation. Second, in *Arnes*, the Court of Appeals stated, in dicta, that the taxpayer's former husband was obligated to become the sole owner of the franchise; such is not the case here. Third, in *Arnes*, the taxpayer's former husband guaranteed the corporation's obligation to the taxpayer; by contrast, Blatt did not guarantee corporation's payment to petitioner. Fourth, unlike Washington, Michigan is not a community property State.

did not adopt the District Court's view that the redemption would be "on behalf of" John if he derived *any* benefit. Therefore, any error perceived in the District Court's rationale in *Arnes* is irrelevant.

Despite the majority's suggestion to the contrary, there is no disagreement between the tax law principles enunciated in *Arnes* and those stated in *Edler v. Commissioner*, 727 F.2d 857 (9th Cir. 1984), affg. T.C. Memo. 1982–67. In *Edler*, the Court of Appeals for the Ninth Circuit agreed in principle that if a corporation's redemption of Mrs. Edler's stock was in discharge of Mr. Edler's obligation to purchase her stock, then the amount paid to Mrs. Edler would be a constructive dividend to Mr. Edler. Prior to their divorce, Mr. and Mrs. Edler owned all the stock of the corporation. The original divorce judgment obligated Mr. Edler to purchase Mrs. Edler's stock interest. However, a subsequent nunc pro tunc order placed that responsibility on the corporation. The Commissioner's argument that the nunc pro tunc order should not be given any effect for tax purposes was rejected by the Court of Appeals, *but* only because the Commissioner had not raised this argument in the lower court. Had the argument been made in the lower court, the result might well have been different. See *Hayes v. Commissioner*, 101 T.C. 593 (1993). In fact, the Court of Appeals noted that "If it were not for the entry of the *nunc pro tunc* order, Commissioner's position would be correct". *Edler v. Commissioner, supra* at 859. [4]

Having analyzed the meaning of the term "on behalf of" by looking to the appropriate principles of tax law for determining whether the redemption was a constructive dividend to John, the Court of Appeals in *Arnes* proceeded to determine whether the redemption relieved John of his obligation to purchase Joann's stock. Whether such an obligation existed must be resolved by reference to State law. *Hayes v. Commissioner, supra* at 600.

The Court of Appeals in *Arnes* looked at the very same transaction and divorce property settlement that is presently before us and held that

---

[4] I agree with the majority that *Edler v. Commissioner*, 727 F.2d 857 (9th Cir. 1984), affg. T.C. Memo. 1982–67, is still legal precedent in the Ninth Circuit, and I assume that the Court of Appeals was well aware of its own opinion in *Edler* when it decided *Arnes*.

John Arnes had an obligation to Joann Arnes that was relieved by Moriah's payment to Joann. That obligation was based in their divorce property settlement, which called for the redemption of Joann's stock. Although John and Joann were the sole stockholders in Moriah, the obligation to purchase Joann's stock was John's, not Moriah's. Furthermore, John personally guaranteed Moriah's note to Joann. Under Washington law, Joann could sue John for payment without suing Moriah. *See* Wash. Rev. Code Ann. §62A.3–416(1) (West 1979). * * * [*Arnes v. United States,* 981 F.2d at 459.]

Because the Court of Appeals held that John, not the corporation, was obligated to purchase Joann's stock, the court concluded that the redemption was used to satisfy John's obligation and therefore was "on behalf of" John. Using the formulation in section 1.1041–1T, Q&A–9, Temporary Income Tax Regs., *supra*, the Court of Appeals held that

Joann's transfer of stock should be treated as a constructive transfer to John, who then transferred the stock to Moriah. * * * [*Arnes v. United States, supra* at 459.[5]]

In direct opposition to the determination by the Court of Appeals, the majority concludes that "petitioner did not have a primary and unconditional obligation to acquire Joann's stock" (majority op. p. 528) and that "Under applicable Washington State law, the property settlement agreement created at most a secondary obligation, which could only mature on Moriah's default on its primary obligation."[6] Majority op. p. 529. The obligation to purchase Joann's stock was either John's obligation or the corporation's. There were no other possibilities. The Court of Appeals, cognizant of Washington State law and looking at the same property settlement agreement and surrounding facts, held that "the obligation to purchase Joann's stock was John's, *not* Moriah's."[7] *Arnes v. United States, supra* at 459 (emphasis

---

[5] It is true that the Court of Appeals did not have the question of John's tax liability before it. However, its conclusion was based on the application of law to undisputed facts identical to those in the instant case. It held that John, not Moriah, was legally obligated to purchase his wife's stock.

[6] The majority's conclusion does not purport to rely on any material facts that were not before the Court of Appeals for the Ninth Circuit, and I am unable to discern any material differences between the statement of facts in the majority opinion and those in the opinion of the Court of Appeals. Both were decided by summary judgment because there were no genuine issues as to any material fact and therefore decision could be rendered as a matter of law.

[7] The majority states, majority op. p. 530, "To the extent this is suggested by the Court of Appeals for the Ninth Circuit in *Arnes v. United States, supra*, we conclude that the obligation is not primary and unconditional, and the statement constitutes dictum." The context in which

added). We should accept the Court of Appeals' determination as controlling rather than attempt to reexamine it. The Court of Appeals' holding is squarely in point with the determinative issue in the instant case. "[B]etter judicial administration requires us to follow a Court of Appeals decision which is squarely in point where appeal from our decision lies to that Court of Appeals and to that court alone." *Golsen v. Commissioner*, 54 T.C. 742, 757 (1970) (fn. refs. omitted), affd. 445 F.2d 985 (10th Cir. 1971).

If, however, the majority disagrees with the Court of Appeals over the application of Washington State law to the undisputed facts, it is incumbent on the majority to explain why it disagrees. Nevertheless, there is no explanation or rationale in the majority opinion on this point.[8] The only cases cited by the majority deal with guarantees, not with the issue of who had the original primary obligation to purchase Joann's stock.[9] In lieu of an explanation, we simply are left with an ex cathedra proclamation that the Court of Appeals was wrong and no guidance for the disposition of future cases.[10]

The Court of Appeals was aware that respondent had asserted a protective income tax deficiency against John and that John was contesting the deficiency in the instant case. *Arnes v. United States, supra* at 457. The Court of Appeals clearly contemplated that John would be treated as the person who redeemed stock from the corporation and that he, rather than his wife, would incur the tax consequences. Thus, the court stated:

the foregoing sentence appears makes it somewhat unclear what the majority is characterizing as "dictum". However, if the majority is saying that the Ninth Circuit's holding that John, not Moriah, was obligated to purchase Joann's stock was "dictum", I must disagree. *Arnes* makes it clear beyond doubt that its holding that John, and not Moriah, was obligated to purchase Joann's stock was absolutely determinative of the outcome of that case and not "dictum". If anything should be characterized as "dictum", it is our disagreement with *Arnes* in *Blatt* where the majority failed to specify why it disagreed with the Court of Appeals and observed that the facts in *Blatt* were easily distinguishable.

[8] At a minimum, one would expect an analysis of the impact of the combination of unique facts that made the instant case "easily distinguishable" from *Blatt*. See *supra* note 3.

[9] According to the Court of Appeals' holding, the guarantees only came into being when the corporation relieved John of his initial personal obligation to purchase his wife's stock.

[10] Whatever the *Blatt* majority's disagreement with *Arnes* may have been, it seems improbable that it involved the application of State law in determining that John, not Moriah, was obligated to purchase Joann's stock. Indeed, the legal analysis in *Blatt* does not even mention State law. Nor did the taxpayer in *Blatt* claim that the redemption satisfied any obligation of her husband. *Blatt v. Commissioner, supra* at 81–82.

Joann's transfer of stock should be treated as a constructive transfer to John, who then transferred the stock to Moriah. The $450,000 was paid to Joann by Moriah on behalf of John. The transfer of $450,000 from the corporate treasury need not escape taxation, if we hold, as we do, that Joann is not required to recognize any gain on the transfer of her stock, because it is subject to section 1041. The tax result for Joann is the same as if she had conveyed the property directly to John. [*Arnes v. United States, supra* at 459.]

The result we reach today directly contradicts the holding of the Court of Appeals to which the instant case is appealable, fails to explain why we disagree with the Court of Appeals, and produces an untenable result in that neither of the two stockholders of Moriah will incur any tax consequences as a result of the $450,000 stock redemption.

PARKER, SWIFT, GERBER and HALPERN, *JJ.*, agree with this dissent.

------

HALPERN, *J.*, dissenting: *Arnes v. United States*, 981 F.2d 456 (9th Cir. 1992), tells us two things: First, the Court of Appeals for the Ninth Circuit will review our decision de novo. *Id.* at 458. Second, because the Court of Appeals held that section 1041 applied to Joann, it is illogical to think that the Court of Appeals will not reverse us. The Court of Appeals held that Joann recognized no gain on account of section 1041. Because of the way section 1041 works, however, a corollary of that holding is that Joann transferred her shares to John, who received them by gift. See sec. 1041(b). It is inconsistent to hold that view (i.e., that John received the shares by gift) and, at the same time, to question whether he received a constructive dividend because he was obligated to buy those shares. That is the question that the majority answers in the negative. The majority has in front of it the exact same transaction addressed by the Court of Appeals in *Arnes*. It seems to me that the decision of the Court of Appeals in *Arnes* (unless the Court of Appeals overrules itself) precludes the Court of Appeals from even considering the majority's theory. To the extent that *Edler v. Commissioner*, 727 F.2d 857 (9th Cir. 1984), affg. T.C. Memo. 1982–67, is inconsistent with *Arnes,* I assume that it was overruled by *Arnes,* sub silentio. *Edler,* of course, predated the enactment of section 1041. Efficiency thus dictates that

we decide for respondent. See *Golsen v. Commissioner*, 54 T.C. 742, 757 (1970), affd. 445 F.2d 985 (10th Cir. 1971). We are free, of course, to set forth (as Judge Beghe has done) the reasons why we believe the Court of Appeals to be wrong. *Id.* On the premises stated, I cannot concur in the decision of the majority.

SWIFT, JACOBS, GERBER, and WHALEN, *JJ.*, agree with this dissent.

