MARK CUNNINGHAM AND LINDA CUNNINGHAM, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Cunningham v. Commissioner
Docket Nos. 22738-91, 12460-92
United States Tax Court
T.C. Memo 1994-474; 1994 Tax Ct. Memo LEXIS 482; 68 T.C.M. (CCH) 801; September 29, 1994, Filed *482 Decisions will be entered for respondent. For petitioners: Joseph B. Hurst, Jr., Walter M. Ebel III, John Ray White, and T. Wesley Holmes. For respondent: Elizabeth S. Simmons. BEGHE
BEGHE
MEMORANDUM FINDINGS OF FACT AND OPINION BEGHE, Judge: Respondent determined deficiencies of $ 11,550, $ 8,400, and $ 9,900.08 in petitioners' Federal income tax for 1987, 1988, and 1989, respectively. The sole issue for decision is whether petitioners Mark and Linda Cunningham are entitled to deduct Mark's monthly payments to his ex-wife, Shirley Cunningham, as alimony. Specifically, if Shirley were to die before Mark had made the 142 payments called for in their settlement agreement, would he be obliged to make the remaining payments? We find that Mark's obligation would continue in the event of Shirley's death, and therefore petitioners are not entitled to deduct the payments as alimony. FINDINGS OF FACT Petitioners resided in Hot Springs, Arkansas, when they filed their petitions in this case. They timely filed their 1987 and 1988 tax returns, and filed their 1989 tax return on August 17, 1990. On each of these returns, petitioners claimed an alimony deduction of $ 30,000 for Mark's *483 payments to Shirley. Mark's gross income from his medical practice for 1987, 1988, and 1989 amounted to $ 355,484, $ 441,310, and $ 217,174, respectively. Mark and Shirley were married on June 18, 1966. On April 8, 1986, Mark sued for divorce in the North Carolina General Court of Justice, and, on July 1, 1986, Shirley filed an answer and counterclaims for alimony, custody, and equitable distribution. On July 7, 1986, the divorce suit was severed from the other claims, and, on July 8, 1986, the North Carolina General Court of Justice granted Mark an absolute divorce from Shirley. Before Mark sued for divorce, Mark and Shirley each retained counsel. Mark retained David E. Matney III, who, although he had represented clients in domestic relations matters, did not hold himself out as an expert in domestic relations law. Shirley retained Howard L. Gum, who was certified as a North Carolina family law specialist and was chairman of the North Carolina Board of Legal Specialization committee that certified family law specialists. Mr. Gum did not hold himself out as a tax specialist. Messrs. Matney and Gum began negotiations on the issues raised by Shirley's counterclaims even before *484 Mark sued for divorce, and those negotiations continued for more than 6 months after the divorce was granted. Initially, Mr. Matney and Mr. Gum each prepared, and proffered to his adversary, his own draft of a settlement agreement. However, Mr. Matney told Mr. Gum that pushing competing drafts back and forth was inefficient and that they should use Mr. Matney's format. Mr. Gum agreed; thereafter, Mr. Matney prepared all further versions, including the final version signed by the parties. In Mr. Gum's initial draft, the payments to settle Shirley's claim for alimony (support payments) were described by a paragraph that read: "Husband agrees to pay Wife as alimony for her sole use and benefit, the sum of Twenty-five Hundred Dollars ($ 2,500.00) per month * * * for a period of 120 months." This description was not used by Mr. Matney in any of his drafts of, or in the final version of, the settlement agreement. One of Mr. Matney's drafts of the settlement agreement included the following provision: If, by reason of illness or disability and consequent or other inability to work, Husband is unable to make [the support] [payments] as herein provided, due to a cessation or substantial *485 reduction of his current regular source of income, then the payments due during such cessation or reduction shall be abated or suspended as the circumstances justify.
Mr. Gum rejected this proposal. He told Mr. Matney that, if he wanted to limit the number of payments to a specified number, Mark would have to make the agreed number of payments. On January 12, 1987, Mr. Gum asked Shirley's accountant, Gary L. Mathes, among other tax questions about the then-current draft of the settlement agreement, whether the support payments would be taxable income to Shirley. In an opinion letter to Mr. Gum dated January 27, 1987, Mr. Mathes wrote that "Regs. § 1.71-I[sic]T(Q10-Q14)states that the agreement should be specific that there is no liability to make payments after the death of the payee spouse". Mr. Mathes concluded that "there is substantial authority under § 71(b)(1)(D) to exclude the payments from gross income of the payee spouse". Before Shirley signed the settlement agreement, she and Mr. Gum discussed Mr. Mathes' conclusion. The support payment provisions reviewed by Mr. Mathes were the same as those included in the final version of the settlement agreement. On January *486 30, 1987, Mark and Shirley executed an agreement entitled "PROPERTY SETTLEMENT AND AGREEMENT AS TO CUSTODY, SUPPORT AND ALIMONY" (the settlement agreement) that settled all Shirley's counterclaims. After Mark and Shirley signed the settlement agreement, Shirley withdrew her counterclaims for alimony, custody, and equitable distribution and, on July 20, 1987, the North Carolina General Court of Justice dismissed the counterclaims. The first article of the settlement agreement is entitled "RECITATIONS, DECLARATIONS AND CONSIDERATION". Paragraph 1.04 of that article states that claims of Shirley (Wife) for equitable distribution, alimony, custody, and child support were still pending. Paragraph 1.05 states: "The parties desire to confirm their settlement of * * * support and maintenance of Wife, and other property rights and obligations growing out of their former marital relation." In paragraph 1.07, Mark and Shirley acknowledge that the provisions of the settlement agreement are adequate consideration. Paragraph 1.08 states that the settlement agreement is effective as of April 1, 1985 (the day after the parties separated), although Mark and Shirley did not sign it until January *487 1987. The second article of the settlement agreement is entitled "PROPERTY SETTLEMENT" (Article 2). It details the roughly equal division of the marital property, which had a total agreed net value of approximately $ 450,000. Paragraph 2.07 is entitled "Distributive Award", and provides that Mark pay Shirley $ 100,000, $ 30,000 by January 30, 1987, provided Shirley had moved out of the marital residence, and $ 70,000 represented by a note, payable in seven monthly installments of $ 10,000 starting February 28, 1987. The note was secured by a second lien Deed of Trust (on property not specified on this record). The third article of the settlement agreement is entitled "ALIMONY AND SUPPORT" (Article 3). It reads as follows: 3.01 Amount and Payment: Husband shall pay to Wife for her support and maintenance the sum of $ 2,500.00 per month on the tenth day of each month, for 142 months. 3.02 Medical Insurance: During the period in which Husband is making alimony payments, Husband shall permit, to the extent permissible under any hospital or medical insurance plans by which Husband is covered, Wife to continue her coverage under such plans, at Wife's expense. * * * 3.03 *488 Assignment and Subrogation: The obligation of Husband to pay and the right of Wife to receive such payments shall not be assigned by Wife and no right of subrogation shall exist with respect thereto. 3.04 Adequacy: Wife acknowledges that the amount herein provided for her support and maintenance is reasonable and adequate in view of the circumstances of the parties, the property settlement provided herein and her potential income from her own efforts and property; and she expressly waives all claims against Husband for alimony, support and maintenance except as expressly provided in this Agreement. 3.05 Modification: The provisions for the support and maintenance of Wife shall not be modified or changed except by further agreement between the parties expressed in writing. 3.06 Separate from Property Settlement: The provisions for the support, maintenance and alimony of Wife are independent of any division or agreement of settlement of properties between the parties and same shall not be for any purpose deemed to be a part of or merged in or integrated with the property settlement of the parties. 3.07 Wife's Attorneys' Fees. Wife waives and releases all rights *489 to reimbursement from Husband for attorneys' fees heretofore or hereafter incurred by her, other than as otherwise provided herein.
The support payments were intended to serve the traditional support and maintenance functions of alimony and to help Shirley gain employable skills that would enable her to become self-sufficient. The support payments were not intended to provide her with the luxury items or discretionary spending that she had enjoyed while married to Mark, but neither were they intended to be contingent on her actual needs. Neither Mark nor Shirley nor either counsel intended the support payments to be contingent on Mark's income or on Shirley's income. Mark, Shirley, and Mr. Gum did not intend the support payments to terminate if Shirley remarried. The fourth article of the settlement agreement is entitled "CUSTODY AND SUPPORT OF CHILDREN" (Article 4). Paragraph 4.01 of Article 4 gives Shirley primary custody of the children, and paragraph 4.04 provides that Mark will pay Shirley $ 600 per child "until the death of husband, and during the term as prescribed in N.C.G.S. 50-13.4, as such now exists." Paragraph 4.05 expressly provides that Mark "shall determine *490 for each year whether or not he shall be entitled to the dependency exemption allowable under the Internal Revenue Code for each of said children. * * * If Husband determines in his sole discretion that he is not entitled, he shall notify Wife". The fifth article is entitled "RELATIONSHIP BETWEEN THE PARTIES". This article waives claims that Mark and Shirley might have against the other's estate. The sixth article is entitled "CONSTRUCTION AIDS". Paragraph 6.01 states: "This agreement contains the entire understanding of the parties, and there are no representations, warranties, covenants or undertakings other than those expressly set forth herein." Paragraph 6.03 provides that the terms and provisions of the settlement agreement will be construed and applied in accordance with the laws of North Carolina. Paragraph 6.04 provides that "all of the provisions of this Agreement shall be binding upon the parties and their respective heirs, next of kin, executors and administrators." The seventh article is entitled "GENERAL PROVISIONS". Paragraph 7.01 of that article states that Mark and Shirley accept the provisions of the settlement agreement "in full satisfaction either may have *491 for claims against the other by reason of their marriage or otherwise." Neither Mark's nor Shirley's counsel wanted the settlement agreement to be approved or adopted by, or otherwise incorporated into an order of, a North Carolina court, and it has never been so approved, adopted, or otherwise incorporated. Mr. Matney did not want the settlement agreement incorporated into a court order because, if it had been so incorporated, Shirley could have enforced it by an action for contempt of court, a North Carolina court could have increased the amount of the support payments, and the support payments could have been extended by court order beyond 142 months. Mr. Gum did not want the settlement agreement incorporated into a court order because a North Carolina court would have had continuing jurisdiction to reduce the support payments if the parties' circumstances changed, which could in turn have caused litigation, which he believed should be avoided, and because the support payments would have been automatically terminated as a matter of law upon the death of either party or Shirley's remarriage. Shirley has never reported the support payments as taxable income, although she has *492 included a disclosure statement with each return. Respondent has sent Shirley a statutory notice of deficiency, which includes the support payments as gross income. Shirley has paid the deficiency and filed a claim for refund. At the time of the trial of this case, she had not filed a refund suit with a U.S. District Court or the Court of Federal Claims. Mark and Shirley have been embroiled in litigation over the settlement agreement. On June 9, 1987, the North Carolina General Court of Justice decided a suit brought by Shirley; the Court awarded Shirley $ 40, which Mark had withheld from the first support payment, which was paid 18 days late, and ordered Mark to perform the provisions of paragraphs 3.01 and 4.04 of the settlement agreement. On March 9, 1990, the North Carolina General Court of Justice decided that Shirley's omission of the support payments from her 1986 North Carolina income tax return did not entitle Mark to damages or rescission of the settlement agreement. [1]
*493 On October 8, 1992, Bruce A. Elmore, Jr., Esq., on behalf of Mark, filed a complaint in the North Carolina General Court of Justice against Mr. Matney, alleging professional malpractice and negligent infliction of emotional distress. This complaint alleges that, before Mark entered the settlement agreement, Mr. Matney told him that all support payments to Shirley would be treated as alimony for Federal and State income tax purposes. This complaint also alleges, on information and belief, that although Mr. Matney told Mark the support payments would be deductible as alimony for income tax purposes, they are not so deductible. Mr. Matney's answer, filed on December 21, 1992, denies that he told Mark the support payments would be deductible as alimony, and alleges that Mark was receiving tax advice from his accountant, David Keller, and that Mark took a proactive interest in the divorce proceedings. OPINION This is a model case for consolidation and consistent treatment of the conflicting claims of ex-spouses for the income tax treatment of periodic payments: Either as alimony, deductible by Mark and includable in Shirley's gross income, or as a property settlement, with the payments *494 neither deductible by Mark nor includable in Shirley's income. Unfortunately, a number of factors, including this Court's lack of jurisdiction over Shirley's tax case, [2] with the parties residing in different Circuits, [3] contribute to the possibility that Mark's and Shirley's tax cases may be disposed of inconsistently. Against this unsatisfactory procedural backdrop, we must interpret an ambiguous agreement. One factor contributing to the ambiguity of the agreement in the salient respect that bears on the Federal income tax treatment of the support payments is that Mr. Matney (and perhaps Mr. Gum) apparently was not aware of the 1986 change and perhaps also the 1984 changes in the statutory *495 Federal income tax definition of alimony. We begin our inquiry by establishing the current definition of alimony under the Internal Revenue Code and by recounting its history. We then refer in turn to North Carolina family law and to North Carolina contract law to establish how the agreement is to be interpreted. We then attempt to interpret the settlement agreement, first by reading it and then by looking to extrinsic evidence. Alimony Under the Internal Revenue Code
Section 215 [4] provides that payments to a former spouse are deductible by the payor spouse if those payments are alimony as defined by new section 71(b) includable in gross income of the payee spouse under new section 71. New section 71(b) provides a four-step inquiry for determining whether a cash payment under a written agreement is alimony. First, the payment must be received by, or on behalf of, a spouse or former spouse; second, the agreement cannot designate that the payment is not includable by the payee spouse or deductible by the payor spouse; third, the payee and payor spouses cannot be members of the same household when the payment is made; and fourth, there can be no liability under the agreement *496 to make any payment for any period after the death of the payee spouse, and there can be no liability to make any payment (in cash or property) as a substitute for such payment after the death of the payee spouse. New sec. 71(b). Liability to make payments must terminate at the death of the payee spouse in order for such payments to be alimony. If a payor spouse continues to be liable to make even one otherwise qualifying payment after the death of the payee spouse, none of the related payments required before the payee spouse's death will be alimony. Sec. 1.71-1T(b), Q&A-13, Temporary Income Tax Regs., 49 Fed. Reg. 34456 (Aug. 31, 1984).[5]
*497 The current law is a result of what became a two-step effort by Congress to redefine deductible alimony. Under section 71, I.R.C. 1954, before enactment of the Deficit Reduction Act of 1984 (DEFRA), Pub. L. 98-369, sec. 422(a) and (b), 98 Stat. 795 (old section 71), periodic payments could be alimony if they were received under a written agreement and as a result of the marital relationship, but they were not alimony if they discharged an obligation, the principal sum of which was specified in the agreement. Old sec. 71(a)(2), (c). Under old section 71, payments were characterized as alimony or as property settlement by considering all the surrounding facts and circumstances. Yoakum v. Commissioner, 82 T.C. 128, 140 (1984); Beard v. Commissioner, 77 T.C. 1275, 1284 (1981). The House Committee on Ways and Means, in its report on H.R. 4170, the progenitor of DEFRA, stated that the definition of alimony provided by old section 71 was "not sufficiently objective." H. Rept. 98-432 (Part 2), at 1495 (1984). The Committee went on to note: "Differences in State laws create differences in Federal tax consequences and administrative *498 difficulties for the IRS." [6]Id. Congress therefore decided to establish a uniform standard for Federal tax purposes by defining "alimony in a way that would conform to general notions of what type of payments constitute alimony as distinguished from property settlements". Id.
Effective for agreements entered after December 31, 1984, and for certain agreements modified on or after January 1, 1985, DEFRA section 422(a) provided the current four-step inquiry, but included the parenthetical "(and the divorce or separation instrument states that there is no such liability [to make payments or substitute payments *499 after the death of the payee spouse])." [7] See sec. 71(b)(1)(D), I.R.C. 1954, as amended by DEFRA (amended sec. 71). According to the parenthetical in amended section 71(b)(1)(D), taxpayers could not rely on local law to terminate payments at the death of the payee spouse. Sec. 1.71-1T(b), Q&A-12, Temporary Income Tax Regs., supra. Therefore, if a written agreement did not state that there was no liability for any period after the death of the payee spouse, payments made under that agreement would not have been alimony under amended section 71. Sec. 1.71-1T(b), Q&A-11, Temporary Income Tax Regs., supra. However, on October 22, 1986, the parenthetical was deleted by the technical correction provisions of the Tax Reform Act of 1986 (TRA), Pub. L. 99-514, sec. 1843(b), 100 Stat. 2853, retroactive to the effective date of DEFRA, TRA sec. 1881, 100 Stat. 2914. Although for more than 2 years it appeared otherwise, a payment called for by a written agreement entered into after December 31, 1984, can be alimony if State law terminates the payor's liability at the death of the payee spouse. Notice 87-9, 1987-1 C.B. 421, 422. *500 Although deletion of the parenthetical returns us to the vagaries of different State law approaches, it results in a more focused inquiry than the facts and circumstances approach of old section 71. See Beard v. Commissioner, 77 T.C. 1275, 1284-1291 (1981) (listing seven "factors" identified from the "morass of the decided cases, many of them irreconcilable"). Respondent and petitioners agree that the settlement agreement provisions for the support payments satisfy all the conditions for alimony treatment under new section 71 except the fourth: whether Mark's liability to make the support payments would terminate in the event of Shirley's death. Because the rights of Mark and Shirley under the agreement have been created by North Carolina law, that law will control their rights, while Federal law will control how those rights are taxed. Morgan v. Commissioner, 309 U.S. 78, 80-81 (1940); Sampson v. Commissioner, 81 T.C. 614, 618 (1983), affd. without published opinion 829 F.2d 39 (6th Cir. 1987). If North Carolina law or the settlement agreement would require *501 the support payments to terminate in the event of Shirley's death, the support payments are alimony under new section 71, deductible from Mark's gross income under section 215. North Carolina Family Law[8]
Mark and Shirley were divorced under North Carolina law, and the settlement agreement is to be interpreted under North Carolina law. If the payments required by the settlement agreement are "alimony" under North Carolina law, Mark's obligation to pay terminates on the death of either Mark or Shirley. Bland v. Bland, 203 S.E.2d 639, 642 (N.C. Ct. App. 1974). *502 Section 50-16.1 of the General Statutes of North Carolina (1987) defines "alimony" as "payment for the support and maintenance of a spouse, either in lump sum or on a continuing basis, ordered in an action for divorce, whether absolute or from bed and board, or an action for alimony without divorce." (Emphasis added.) For judgments entered after January 11, 1983, every court-approved settlement agreement is considered to be so ordered. Marks v. Marks, 342 S.E.2d 859, 861 (N.C. 1986); Walters v. Walters, 298 S.E.2d 338, 342 (N.C. 1983); cf. Bunn v. Bunn, 136 S.E.2d 240, 242 (N.C. 1964) (payments that "the court merely approves or sanctions" are not alimony); Crane v. Green, 441 S.E.2d 144, 145 (N.C. Ct. App. 1994) (except in the area of family law, a consent judgment is generally nothing more than a contract that is entered upon the record of the court). However, section 50-16.1 of the General Statutes of North Carolina still requires court action on an agreement before payments under that agreement can be alimony. See Marks v. Marks, supra at 862 *503 ("'court order' confers jurisdiction"). The parties' designation of the payments as "alimony" is not conclusive. White v. White, 252 S.E.2d 698, 702 (N.C. 1979). Walters v. Walters, supra, expanded the meaning of alimony to include payments made under court approved agreements, but it did not otherwise change the character of payments not made under court approved, adopted, or ordered agreements. Under North Carolina law prior to Walters v. Walters, supra, payments made under an agreement were not alimony if a North Carolina court did not order or adopt the agreement. Bunn v. Bunn, supra at 242. Therefore, if an agreement requiring support and maintenance payments is not submitted to a court for its approval, payments required under such agreement have not been ordered in an action for divorce, and they will not be alimony under North Carolina law. Neither party wanted the settlement agreement to be approved or adopted by a North Carolina court, and the settlement agreement was not submitted to any court for approval or adoption. The support *504 payments are therefore not alimony as defined by the laws of North Carolina, and North Carolina law regulating alimony would not terminate Mark's liability to make those payments. North Carolina Contract Law
Although the support payments are not alimony under North Carolina law, they have been made pursuant to the settlement agreement, and, "By not coming to court, the parties [preserved] their agreement as a contract, to be enforced and modified under traditional contract principles." Walters v. Walters, supra at 342; cf. N.C. Gen. Stat. sec. 50-16.9(a) (1987) (alimony under a court-adopted agreement may be modified or vacated, upon motion of, and a showing of changed circumstances by, either party). "The heart of a contract is the intention of the parties", Lane v. Scarborough, 200 S.E.2d 622, 624 (N.C. 1973) (quoting Gould Morris Electric Co. v. Atlantic Fire Ins. Co., 50 S.E.2d 295, 297 (N.C. 1948)), so contracts must be interpreted to ascertain that intention, Bland v. Bland, supra at 641. The intention of the parties to an agreement is *505 ascertained by examining the entire agreement, with an understanding of the result to be accomplished and the situation of the parties at the time the contract was made. Haynes v. Haynes, 263 S.E.2d 783, 787 (N.C. Ct. App. 1980) (quoting Yount v. Lowe, 215 S.E.2d 563, 567 (N.C. 1975)). If an agreement in a written instrument is unclear, parol evidence is competent to clarify, but not to contradict, the agreement of the parties. International Paper Co. v. Corporex Constructors, Inc., 385 S.E.2d 553, 556 (N.C. Ct. App. 1989). Where the Tax Court is "called upon to make a State law determination as to the existence and extent of legal rights and interests created by a written instrument, we must look to that State's parol evidence rule in deciding whether or not to exclude extrinsic evidence". Estate of Craft v. Commissioner, 68 T.C. 249, 263 (1977), affd. 608 F.2d 240 (5th Cir. 1979) "Ambiguities in contracts are to be resolved by a trier of fact upon consideration of a range of factors including the expressions used, the subject *506 matter, the end in view, the purpose and the situation of the parties." International Paper Co. v. Corporex Constructors, Inc., supra at 556. Petitioners assert that the holdings in Commissioner v. Lester, 366 U.S. 299 (1961) (interpreting sec. 22(k), I.R.C. 1939[9] ), Grummer v. Commissioner, 46 T.C. 674, 679 (1966), and Estate of Craft v. Commissioner, supra at 263-264, prevent us from examining extrinsic evidence to decide whether payments between former spouses are alimony. We agree that "the precise statutory requirements of [old] section 71(b)[10] and the pronouncements of the Lester decision create an exception to the general [parol evidence] rule". Grummer v. Commissioner, supra at 680. Those Code sections require us to distinguish between alimony and child support by examining the terms of a written instrument. New section 71(b), however, does not require us to determine whether a written instrument fixes a party's obligation. It requires us to determine whether there is a written agreement and whether *507 there is an obligation that would terminate upon the death of the payee spouse. Although, for the narrow purpose of distinguishing between alimony and child support, old section 71(b) and section 22(k), I.R.C. 1939, confine our inquiry to the document, new section 71(b) does not so confine our inquiry. Liability under the Settlement Agreement
The settlement agreement does not specify whether the payments described in paragraph 3.01 are for 142 months absolute or for 142 months only if Shirley survives. Paragraph 3.01 of Article *508 3 reads: "Husband shall pay to Wife for her support and maintenance the sum of $ 2,500.00 per month on the tenth day of each month, for 142 months." [11] Standing alone, this paragraph is ambiguous. It is unclear whether Mark's liability to make payments is for a fixed term or whether it is contingent on Shirley's need for support and maintenance [12] and hence would stop in the event of her death. To establish whether Mark and Shirley intended Mark's liability to terminate in the event of the *509 death of Shirley, we look first to the other provisions of the settlement agreement, and then, not having established whether Mark's liability would terminate under the settlement agreement as written, we look to extrinsic evidence. Intent as Shown by the Settlement Agreement
Paragraph 3.02 provides that "During the period in which Husband is making alimony payments, Husband shall permit, to the extent permissible under any hospital or medical insurance plans by which Husband is covered, Wife to continue her coverage under such plans, at Wife's expense." If the support payments are to terminate in the event of Shirley's death, the period during which Mark would be required to permit Shirley to continue coverage would also terminate. If the support payments are for a fixed term, paragraph 3.02 can be read to imply that Mark would be required to permit Shirley (or her estate) to continue her health insurance coverage in the event of her death, a requirement that would make no sense. However, the parties may have relied on the insurance plans to terminate coverage in the event of Shirley's death so as to avoid any such requirement. Paragraph 3.02 can also be read to imply *510 that, because Shirley would need hospitalization and medical insurance only during her lifetime, Mark would only need to permit her to continue coverage during her lifetime, and that he would only need to make alimony payments during the period that he needed to make insurance available. However, such a reading is circular, making continuation of the support payments depend on insurance availability, which depends on continuation of the support payments. Paragraph 3.04 indicates that the support payments are not contingent on Shirley's actual needs. Shirley acknowledges that the support payments are "adequate in view of the circumstances of the parties". However, any change in the circumstances of the parties would in all likelihood not change the amount or frequency of the support payments because the support provisions are not modifiable except with the mutual, written consent of the parties. [13] It seems unlikely that, after engaging in negotiations for almost 2 years to arrive at the settlement agreement, either party would have been willing, or would reasonably have expected the other party to be willing, to make concessions beyond those made during negotiations. *511 The death of a contracting party will not generally change or terminate contractual obligations, unless the contract explicitly so provides. Shutt v. Butner, 303 S.E.2d 399, 401 (N.C. Ct. App. 1983). Upon the death of a contracting party, the decedent's personal representative becomes bound by executed contracts, even if they are not specifically referred to in the contract. Shutt v. Butner, supra at 401 (quoting Burch v. J.D. Bush & Co., 106 S.E. 489, 490 (N.C. 1921)). However, paragraph 6.04 of the settlement agreement provides additional assurance that the settlement agreement would bind heirs, next of kin, executors, and administrators. See Shutt v. Butner, supra at 401. Although the settlement agreement does not specify whether Mark's obligation to make support payments would terminate in the event of Shirley's death, any continuing obligation under the settlement agreement clearly would survive her death. The settlement agreement confirms settlement of Mark's and Shirley's "property rights, custody, support, and education of their children, *512 support and maintenance" of Shirley. Article 2 confirms settlement of their property, and Article 4 confirms settlement of custody, support, and education of the children. Article 3 confirms Shirley's release of her right to support and maintenance in exchange for specified payments by Mark. [14]
Petitioners argue that, if the support payments were part of the property settlement, Shirley would have been allocated over 100 percent of the marital property. We might agree if the parties' valuation included all of their property. However, petitioners did not provide us with a complete list of the marital property and its values. After comparing the total value of the property accounted for under the settlement agreement, approximately *513 $ 450,000, with Mark's gross income from his medical practice for 1987, 1988, and 1989, $ 355,484, $ 441,310, and $ 217,174, respectively, we do not think that the value of Mark's medical degree was included in the property settlement. See Gum v. Gum, 421 S.E.2d 788 (N.C. Ct. App. 1992) (unequal division of property was equitable because wife contributed to the family while husband obtained a law degree); O'Brien v. O'Brien, 489 N.E.2d 712, 715 (N.Y. 1985) (a medical degree and a license are marital property subject to equitable distribution). In the article entitled "CUSTODY AND SUPPORT OF CHILDREN", [15] *514 paragraph 4.04 establishes that child support payments are subject to contingencies. Such payments will be made "until death of Husband, and during the term prescribed in N.C. Gen. Stat. 50-13.4," which establishes when child support payments ordered by a court would terminate. The specificity in dealing with contingencies in this article contrasts with the lack of specificity in Article 3.[16]
Paragraph 4.05 of the same article provides that, for each child and each year, Mark will decide whether or not he is entitled to a dependency deduction, and if he is not entitled to a dependency deduction for any year, he will send Shirley notice of his decision. The settlement agreement does not require Shirley to sign any declaration or release. [17]
*515 It appears that paragraph 4.05 was drafted with the intent of complying with section 152(e), I.R.C. 1954, before enactment of DEFRA section 423, 98 Stat. 799 (old section 152). If that is true, it seems likely that paragraph 3.01 was drafted with the intent of qualifying the support payments as alimony under old section 71. However, payments that would qualify as alimony under old section 71 would not necessarily qualify as alimony under amended section 71 or new section 71. Prior to enactment of DEFRA section 423, payments generally were not alimony if they discharged an obligation whose principal sum was specified in the written agreement. Old sec. 71(c)(1). However, old section 71(c)(2) provided a safe harbor. If payments were to be made over more than 10 years and the total payments for a year were not greater than 10 percent of the principal sum, the payments could be alimony. Old sec. 71(c)(2). The settlement agreement purports to provide that the support payments would be made over more than 10 years and that the support payments made during each year would be less than 10 percent of the principal sum. [18] If the parties to the settlement agreement thought that old *516 section 71 applied, they might have intended the support payments to fit within the safe harbor of old section 71(c)(2)[19] or they might have intended the support payments to stop in the event of Shirley's death. Although the child support provisions of paragraph 4.05 indicate that Mark and Shirley and their counsel may not have been aware of the alimony requirements of new section 71, those provisions do not indicate whether they inadvertently complied with those requirements. Article 2, entitled "PROPERTY SETTLEMENT", *517 obligated Mark to pay Shirley $ 100,000, $ 70,000 of which was to be represented by a promissory note, secured by a second lien deed of trust, and scheduled for payment in seven monthly installments of $ 10,000. Although the paragraph in which Mark promised to pay $ 100,000 does not specifically provide that his liability would survive in the event of Shirley's death, it clearly would have done so. If the support payments were to be for a fixed term absolute, they too could have been memorialized by a promissory note, but the lack of a note is not conclusive evidence that the payments were contingent on Shirley's surviving the term over which they were to be paid. A promissory note is not required for liability to survive a party's death, and the note referred to in the property settlement may have been desired to simplify the use of a deed of trust, see, e.g., N.C. Gen. Stat. sec. 45-37 (1991) (deed of trust discharged and released by exhibition of the deed of trust and endorsed note). Because the settlement agreement taken as a whole does not demonstrate whether the parties to the settlement agreement intended the support payments to terminate in the event of Shirley's death, *518 we must examine extrinsic evidence in our continuing effort to ascertain their intent. Intent as Shown by Extrinsic Evidence
The settlement agreement deals with and disposes of Shirley's counterclaims for alimony, custody, and equitable distribution. By entering into the settlement agreement, both parties conceded benefits and gained advantages that they might or might not have been held entitled to if Shirley had pursued her suit to a conclusion. Shirley gave up the possibility of receiving larger, court-ordered alimony payments for as long as she should live. On the other hand, she avoided possible litigation, which could have resulted in lower alimony payments and possible future reductions in, or termination of, alimony payments if the parties' circumstances had changed. Mark gained the certainty of limiting his liability to no more than a specified number of fixed payments, but he -- and possibly his estate -- gave up the potential of being obligated to make fewer payments if Shirley could begin to support herself at an earlier time or if he became unable to support her before expiration of the 142 months. There is no evidence that, during negotiations, the parties *519 discussed increasing or decreasing the amount or term of the support payments on the basis of their deductibility or non-deductibility. However, Mr. Gum testified that, if he had thought Shirley would be required to include the support payments in her gross income, he would have tried to negotiate larger payments. We have not been given Shirley's expected income and deductions for the years in issue, so we are unable to measure the respective tax costs that the parties would have been considering when negotiating the settlement agreement. [20]
Mr. Matney testified that he intended the payments to be deductible [21] and that, because he wanted the settlement agreement to be retroactive to April *520 1, 1985, Mr. Gum knew of that intention. However, Mr. Gum testified that he "wasn't sure where they [Mark and Mr. Matney] were going with that one [paragraph 1.08]." In a letter dated October 7, 1986, Mr. Gum questioned the effect of paragraph 1.08, but stated that "Shirley would be agreeable to allocating the previously received payments as alimony." However, he went on to disclaim whether allocation of the previous payments would be honored by the Internal Revenue Service and what tax treatment Shirley would use on her future returns. Prior to execution of the settlement agreement, Mr. Gum sought assurance from Shirley's accountant, Mr. Mathes, that the support payments would not be includable in Shirley's gross income. In an opinion letter dated January 27, 1987, Mr. Mathes concluded that "there is substantial authority * * * to exclude the payments", *521 but he appears to have relied on the fact that the agreement did not specify that liability would terminate at Shirley's death; i.e., the parenthetical deleted by TRA section 1881, 100 Stat. 2914, enacted on October 22, 1986. [22]
The effect of making the settlement agreement retroactive was to cause the settlement agreement to appear to require the support payments to be made over a term of more than 10 years, which, if so required, would have qualified the payments as alimony under the safe harbor of old section 71(c)(2). Although the intended *522 and actual tax effect of paragraph 1.08 is unclear, we think Mr. Gum knew that Mark intended to deduct the payments as alimony. However, as paragraph 4.05 indicates, the parties to the settlement agreement, or at least the drafter, Mr. Matney, did not seem to be aware of amendments to the Code affecting written agreements and the specific requirements of those amendments. [23] We do not equate Mr. Gum's knowledge that Mark intended to deduct the payments with knowledge that the payments were intended to stop in the event of Shirley's death. *523 Mark wanted the support payments to be deductible, and he told Mr. Matney that he wanted that result. If both parties to the settlement agreement wanted that result and had understood the applicable tax requirements needed to make them deductible, we could infer that they intended the agreement to satisfy those requirements. Because neither Mark nor Mr. Matney appears to have understood that new section 71 required the support payments to terminate in the event of the death of Shirley, we are unable to infer that they had considered that requirement when Mark signed the settlement agreement. It is therefore less likely that they intended the settlement agreement to meet that requirement than if they had understood and considered it. Mr. Matney testified that, when he used the term "alimony" in the settlement agreement, he intended it to have the same definition as in North Carolina law, and that, under North Carolina law, "alimony" terminates upon the death of either spouse. Mr. Gum testified that "alimony" has different meanings depending on context, but that, when he used the term "alimony" in the settlement agreement, he intended it to have the same general definition as *524 in Webster's Dictionary. Although we "must treat the payments according to their substance and not according to labels that the parties used", Steen v. Commissioner, 923 F.2d 603, 606 (8th Cir. 1991), affg. T.C. Memo. 1989-542, we consider the parties' labels as evidence of their intent. As discussed supra pp. 15-17, neither party to the settlement agreement intended that it be approved or adopted by a North Carolina court, and it was not submitted to a court for approval or adoption. If the support payments were not approved or adopted by a North Carolina court, they are not alimony as defined by the laws of North Carolina. Marks v. Marks, 342 S.E.2d at 861; Walters v. Walters, 298 S.E.2d at 342. Early in the negotiations, each counsel was using his own format of a draft settlement agreement. Mr. Matney told Mr. Gum that this was inefficient and that the parties should use his format. Mr. Gum agreed, and thereafter, Mr. Matney prepared the draft and executed settlement agreements. In Mr. Gum's initial draft, the support payments were described by a paragraph *525 that read: "Husband agrees to pay Wife as alimony for her sole use and benefit, the sum of Twenty-five Hundred Dollars ($ 2,500.00) per month * * * for a period of 120 months." Although Mr. Gum's draft does not make it clear that the support payments would terminate in the event of Shirley's death, they do make it clear that the payments were to be "alimony" (definition unknown). Mr. Matney, who testified that he intended the support payments to be alimony under North Carolina law and who used the term "alimony" to describe them elsewhere in the settlement agreement, did not include the term "alimony" in the paragraph describing the support payments, nor did he state that they were "for her sole use and benefit". We find that the parties to the settlement agreement did not intend "alimony" to be restricted to the definition provided by the General Statutes of North Carolina. We find it more likely that they used "alimony" as a shorthand term for "payments to settle Shirley's claim for alimony". We attach little significance to the use of the term "alimony" in the settlement agreement. Even though the payments are not intended to be "alimony" under North Carolina law, it is not *526 clear from the settlement agreement whether Mark would continue to be liable to make the payments if Shirley died, or whether that liability would terminate in the event of her death. The parties to the settlement agreement expected Shirley to use the payments like traditional alimony, for her support and maintenance, but they limited the term of the payments, expecting that she would use the payments to gain employable skills that would enable her to become self-supporting. That expected dual use of the support payments goes beyond the traditionally expected use of alimony payments. Such dual use weakens the traditional correlation between alimony payments and the payee spouse's need for support and maintenance, and weakens the significance of the phrase "for her support and maintenance" in paragraph 3.01 of the settlement agreement. Other considerations further weaken the significance of the phrase "for her support and maintenance". The continuation of payments after events that traditionally end the need for support and maintenance indicates that the payments are not limited to her support and maintenance. The failure to provide expressly for likely changes in Shirley's needs *527 (i.e., employment, remarriage, or death), indicates that the parties were not concerned with her actual needs, and that the support payments were independent of her needs for support and maintenance. The fixed term of the payments was intended to give Shirley the time and resources to become self-sufficient. However, the settlement agreement did not provide for modification of the support payments if she should become self-sufficient or partially self-sufficient before the end of 142 months. Likewise, even if she had not become self-sufficient at the end of 142 months, the support payments would not continue, and she could not look to the North Carolina courts for relief. That the payments are independent of Shirley's actual needs for support and maintenance is further supported by the failure of the settlement agreement to require any accounting for Shirley's use of the payments although their use is supposedly limited to "her support and maintenance". It appears that the use of the phrase "for her support and maintenance" was not a strict limitation on the payments. If Shirley's needs were reduced by reliance on a third party, or by her own efforts, Mark continued to be liable *528 to make 142 payments of $ 2,500. If Shirley needed additional support after Mark had made 142 payments, he would not be liable to make any more payments. Because the payments are not contingent on these events, we find it likely that they are not contingent on other events that would change her need for support and maintenance. Discussions during negotiations indicate that the payments were not intended to be contingent on anything. In an early draft of the settlement agreement, Mr. Matney proposed that the support payments be abated or suspended if Mark became disabled and his income was reduced by that disability. [24] Mr. Matney testified that Mr. Gum rejected this proposal and told him: "if you want to limit it [payments] to the fixed number of payments as opposed to how long she lives, he [Mark] pays it no matter -- it is his problem to figure out how to pay the money if he gets disabled." Mr. Gum testified he was sure that he made it clear that "If we are not going to get it [payments] for life, we want to get it for sure." *529 Although the intent of the parties to the settlement agreement is not clear from the document or from the extrinsic evidence presented, we find that both parties thought the support payments would be made for the full 142 months, [25] and that neither party considered the consequences of Shirley's death. Although the parties may have expected Shirley to use the payments for her support and maintenance, and the agreement actually settled a claim for alimony, the resulting obligation was not limited by the metes and bounds of the joint lives and remarriage contingencies that circumscribed the underlying claim. To reflect the foregoing, Decisions will be entered for respondent. Footnotes
1. North Carolina income tax is calculated on Federal taxable income, adjusted for certain items. N.C. Gen. Stat. sec. 105-134↩ (1989). However, the North Carolina court's order does not indicate whether the court considered, or had to consider, whether the support payments would terminate upon Shirley's death when it found that Mark was not entitled to relief.
2. It bears noting that Shirley, who testified in this case under subpoena by respondent, declined, after consultation with her counsel, this Court's invitation to brief the issues as a friend of the Court.↩
3. Cf. Arnes v. Commissioner, 102 T.C. 522, 542↩ n.10 (1994) (Beghe, J., concurring).
4. Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the years in issue. However, because sec. 71 has been amended twice and because we discuss all three versions of sec. 71, we use the term "new section 71↩" to refer to the section in effect for the years in issue.
5. Although some parts of the temporary regulations have been superseded by amendments to the Code, this Q&A does not appear to have been affected.↩
6. This diagnosis echoed the dissatisfactions expressed by commentators. See, e.g., Kuntz, "Simplification of the Definition of Periodic Payments in Internal Revenue Code Section 71", 47 Cinn. L. Rev. 213 (1978); Steines, "A Reappraisal of the Taxation of Wealth Transfers Incident to Divorce", 56 Wash. L. Rev. 217, 218-227, 230-232, 237-244↩ (1981).
7. This parenthetical was added to H.R. 4170 by the conference committee, and we could find no explanation for its addition. See H. Conf. Rept. 98-861, at 1117 (1984), 1984-3 C.B. (Vol. 2) 1, 371.↩
8. Although Messrs. Matney and Gum testified about applicable principles and rules of North Carolina law, we have considered their testimony only to determine their knowledge and intent (attributable to Mark and Shirley) when the settlement agreement was entered into. We have not considered their testimony in our analysis of North Carolina law or its application to the settlement agreement. See Estate of Carpenter v. Commissioner, T.C. Memo. 1993- 97↩.
9. Sec. 22(k), I.R.C. 1939↩, provided in part that alimony did not include the portion of payments imposed under a written agreement "which the terms of the * * * written instrument fix * * * as a sum which is payable for the support of minor children".
10. Old sec. 71(b)↩ provided in part that alimony did not include the portion of payments imposed under a written agreement "which the terms of the * * * agreement fix * * * as a sum which is payable for the support of minor children".
11. Because the effective date of the settlement agreement is Apr. 1, 1985, Mark was obligated to make 120 payments from the date the settlement agreement was signed.↩
12. At trial neither petitioners' counsel nor respondent's counsel focused the witnesses' attention on the phrase "for her support and maintenance", so we have received little guidance from them on its intended meaning at the time the separation agreement was executed or on its relationship to the need for continuing payments in the event of Shirley's death.↩
13. Compare North Carolina courts' power to supervise and modify alimony payments. See N.C. Gen. Stat. sec. 50-16.9(a)↩ (1987).
14. Although it is possible to read the phrase "for her support and maintenance" in par. 3.01 as describing the consideration running from Shirley Cunningham to Mark Cunningham in exchange for his promise to make 142 payments of $ 2,500 each, we do not think the parties intended that reading.↩
15. The settlement agreement is final and binding as to property and alimony but not as to custody and support of the parties' minor children, Perry v. Perry, 234 S.E.2d 449 (N.C. Ct. App. 1977), and there is no statute of limitations on a suit for the children's support, Cogdell v. Johnson, 264 S.E.2d 816, 818↩ (N.C. Ct. App. 1980).
16. Petitioners have not attempted to show that "for her support and maintenance" is a term of art under North Carolina law, and we found no cases describing it as such.↩
17. Messrs. Gum and Matney apparently confused the specific requirements of sec. 152(e), as amended by the DEFRA sec. 423, 98 Stat. 799, with the requirements before amendment by DEFRA. Before enactment of DEFRA, sec. 152(e) provided that the noncustodial parent would be entitled to a dependency deduction if a written separation agreement provided that the noncustodial parent was entitled to the dependency deduction. After enactment of DEFRA, sec. 152(e)↩ provides that the custodial parent is entitled to claim a child as a dependent unless the custodial parent signs a declaration stating that he or she will not claim the child as a dependent, and the noncustodial parent attaches such declaration to his or her return.
18. The income tax regulations under old sec. 71 provided another exception for payments that were contingent on the death of either spouse (whether set forth in the agreement or imposed by local law) and that were in the nature of alimony. Sec. 1.71-1(d)(3),Income Tax Regs.↩ If we find that the payments were to stop upon Shirley's death, the payments would have qualified under this exception, too.
19. We express no opinion as to whether the payments would fit within that safe harbor provision.↩
20. Although TRA sec. 101(a), 100 Stat. 2096, compressed the rate spread and reduced the importance of this consideration, it did not eliminate the potential tax savings of shifting income to the spouse with lower taxable income (below $ 23,900 if head of household, and below $ 17,850 if unmarried but not head of household).↩
21. However, in his answer to Mark's complaint for malpractice and negligence, Mr. Matney denies that he told Mark that the support payments would be deductible.↩
22. Although Mr. Mathes cited Temporary Income Tax Regs. sec. 1.71-1T(b), Q&A-10 to 14, 49 Fed. Reg. 34456 (Aug. 31, 1984), as authority for his conclusion, portions of that regulation have been overridden by TRA sec. 1881, 100 Stat. 2914. We note again that the temporary regulations have still not been replaced by final regulations. See Arnes v. Commissioner, 102 T.C. 522, 542↩ n.10 (1994) (Beghe, J., concurring).
23. Mr. Matney testified that the settlement agreement did not contain a provision explicitly providing that the support payments would terminate in the event of Shirley Cunningham's death because North Carolina law would terminate them upon her death. However, under amended sec. 71, which was applicable at the time Mr. Matney was drafting the settlement agreement, taxpayers could not rely on local law to terminate payments. Sec. 1.71-1T(b), Q&A-12, Temporary Income Tax Regs., supra. At trial, Mr. Matney did not remember whether he intended the support payments to terminate in the event of Shirley's remarriage, but in view of his asserted meaning of "alimony", it appears likely that he thought the support payments would have terminated upon her remarriage. See N.C. Gen. Stat. sec. 50-16.9(b)↩(1987).
24. If the payments were alimony under North Carolina law, they would have been modifiable by a court without this provision, see N.C. Gen. Stat. sec. 50-16.9(a)↩ (1987), further undercutting Mr. Matney's assertion that he intended the support payments to be alimony under North Carolina law.
25. Because there was a very high likelihood that Shirley would survive the term of the support payments, we do not think that the parties considered the possibility that she would not survive.↩